Opinion for the Court filed by Senior Circuit Judge EDWARDS, with whom Circuit Judges ROGERS, TATEL, and
BROWN join, and with whom Circuit Judge GRIFFITH joins except as to Part III.D, and with whom Circuit Judges GINSBURG and GARLAND join as to Parts I, III.D, III. E, and IV.
Concurring opinion filed by Circuit Judge GRIFFITH, with whom Circuit Judges ROGERS and TATEL join, except as to footnote 2.
Dissenting opinion filed by Circuit Judge KAVANAUGH, with whom Chief Judge SENTELLE and Circuit Judges HENDERSON and RANDOLPH join.
EDWARDS, Senior Circuit Judge:
On the evening of December 19, 2003, police officers received a broadcast “lookout” for an armed robber. Appellant Paul Askew, who wore clothing similar, but not identical to that described in the lookout, was stopped. The police then conducted a Terry “frisk” which produced nothing. Some time after the frisk was completed, the police moved appellant to a place where he could be seen by the complaining witness. The officers’ purpose was to determine whether the complainant could identify appellant as her assailant. The District Court’s findings of fact indicate that appellant complied during the stop and was not handcuffed during the identification show-up. Preparatory to the show-up, but without appellant’s consent, one of the officers attempted to unzip appellant’s outer jacket to reveal to the complainant what appellant had on under the jacket. The officer’s unfastening of the jacket was interrupted when the zipper hit a hard object at appellant’s waist. Appellant then pushed the officer’s hand away from his jacket. These latter events aroused the officer’s suspicion, but the officer did nothing and the show-up continued. Although appellant was not implicated by the com *1122 plaining witness, the police officers continued to detain him, walked him backwards towards a police vehicle, placed him on the hood of the car, and then fully unzipped his jacket. The officers found a gun in an open waist pouch and arrested appellant.
In April 2004, after the District Court denied his Fourth Amendment motion to suppress the Government’s evidence, appellant entered a conditional guilty plea to a one-count indictment charging him with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Appellant reserved his right to appeal the District Court’s denial of his motion to suppress. See Fed.R.CrimP. 11(a)(2). On June 29, 2004, the District Court sentenced appellant to 36 months’ imprisonment, followed by three years’ supervised release. Gov’t En Banc Br. at 2; Appellant En Banc Br. at 2.
On April 6, 2007, a divided panel of the court affirmed the District Court’s denial of appellant’s motion to suppress. On July 12, 2007, the panel’s judgment was vacated and an order was issued granting appellant’s petition for rehearing en banc. The order granting en banc review instructed the parties to address the following issue:
[Wjhether during a Terry stop police officers may unzip a suspect’s jacket solely to facilitate a show-up. In addressing this question, the parties should consider whether the officers’ action was a lawful search under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny.
United States v. Askew, No. 04-3092, Order Granting En Banc Review (D.C.Cir. July 12, 2007). The. order made clear that the only issue before the en banc court was whether the first, partial unzipping was unlawful. There is no dispute that if the partial unzipping was unlawful, the discovery of the hard object at appellant’s waist during that unzipping cannot justify the second full unzipping that yielded the gun.
On April 10, 2008, after oral arguments were heard by the en banc court, an order was issued instructing the parties to submit supplemental briefs addressing the following questions:
1. Assuming, arguendo, that it is not dispositive that the unzipping was a search, was the gun evidence nonetheless inadmissible as the product of steps taken to facilitate a show-up witness’ identification, on a theory that there were not reasonable grounds for believing that unzipping the jacket would establish or negate the suspect’s connection with the crime under investigation?
2. Was the gun evidence admissible as the product of a valid protective search, on a theory that regardless of the officer’s subjective intent the initial unzipping was an objectively reasonable response to the suspect’s conduct during the pat-down?
3. Was the gun evidence admissible under the doctrine of inevitable discovery, on a theory that the officers had not completed the pat-down but would have done so after the show-up?
United States v. Askew, No. 04-3092, Order (directing supplemental briefing) (D.C.Cir. Apr. 10, 2008).
As described in its opening brief, the Government submits that the principal question for this court is whether the police “violate[d] appellant’s Fourth Amendment rights by partially unzipping [his] outer jacket during a show-up identification procedure, so that a robbery victim could see whether appellant’s sweatshirt matched that of the robbery perpetrator.” Gov’t En Banc Br. at 13; see also id. at 22, 24. Applying Minnesota v. Dickerson, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 *1123 (1993), and the precedent on which it rests, to the District Court’s uncontested findings of fact, a five-judge plurality of this court concludes that the answer to this question is yes. Because the police officer’s unzipping of appellant’s jacket went beyond what was necessary to protect the investigating officers or others nearby, it amounted to precisely the sort of eviden-tiary search that is impermissible in the context of a Terry stop.
Even assuming, arguendo, that an unzipping to facilitate a show-up is permissible under some circumstances, a majority of the court is nonetheless satisfied that the police officer’s actions cannot be justified here since there were no reasonable grounds for believing that the unzipping would establish or negate appellant’s identification as the robber in question.[1] A majority of the court is also satisfied that the Government’s alternative argument, that the search of appellant can be justified as an objectively reasonable continuation of the protective frisk, is both contrary to the District Court’s factual findings and unsupportable on any plausible reading of the record.
Finally, the Government concedes that “[t]he gun is not admissible under a theory of ‘inevitable discovery.’ ” Gov’t Supplemental Br. at 12. As the Government explains, it “did not make an inevitable-discovery argument before the district court, and thus failed to elicit” the testimony necessary to support such a theory under Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Gov’t Supplemental Br. at 14. Moreover, the Government acknowledges that “[bjecause the inevitable-discovery theory raises factual issues that could have been addressed at the suppression hearing but were not, [it does] not believe that [it is] in a position to request a remand for further development of the record.” Id. at 15 n. 7.
I. The District Court’s Factual Findings
Following completion of the hearing on appellant’s suppression motion, the District Court set forth its factual findings in a published opinion. See United States v. Askew, 313 F.Supp.2d 1 (D.D.C. 2004). “[A]ppellate courts must constantly have in mind that their function is not to decide factual issues de novo.” Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (quotation marks omitted). Thus, as the Government rightly points out, “[t]his court must accept the district court’s findings of fact unless clearly erroneous.” Gov’t En Banc Br. at 15. This rule is firmly entrenched in Supreme Court precedent, see Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), and in applying it we “overstepf ] the bounds of [our] duty ... if [we] undertaken to duplicate the role of the lower court,” Bessemer City, 470 U.S. at 573, 105 S.Ct. 1504. This is especially so when, as here, the trial court is required to reconcile differences in testimony in order to make factual findings. See Mar. 26 Tr. at 29-31; see generally Bessemer City, 470 U.S. at 573-76, 105 S.Ct. 1504.
Notably, neither party challenged the District Court’s findings in this case. In fact, in its brief filed with the panel, the Government characterized the District Court’s factual findings as “consistent with the government’s evidence at the suppression hearing.” Gov’t Panel Br. at 9. Even if those findings had been challenged, we could not overturn them unless we were “definitely and firmly convinced that a mis *1124 take [had] been committed.” Bessemer City, 470 U.S. at 573, 105 S.Ct. 1504. Because there are no grounds for such a conclusion, the District Court’s factual findings constitute the record by which appellate review is bound. Consequently, they are, in pertinent part, reproduced below.
On the night of December 19, 2003, around 11:00 p.m., a radio run alerted Officer Anthony Bowman of the Metropolitan Police Department to a report of an armed robbery in the 700 block of 9th Street, S.E., in Washington, D.C. Officer Bowman canvassed the area in his patrol car, looking for individuals matching the description of the perpetrator: a black male, approximately six-feet tall, wearing a blue sweatshirt and blue jeans. The radio report reflected that the perpetrator had been last seen moving on 9th Street, S.E., in an unknown direction.
Within two minutes of the radio report, and within approximately ten minutes of the robbery, Officer Bowman spotted defendant Paul Askew walking in the 200 block of 9th Street, S.E., five blocks from the scene of the robbery. Upon seeing Officer Bowman, the defendant turned and walked in a different direction, but Officer Bowman continued to follow the defendant in the patrol car. Defendant is a black male, six-feet, three-inches tall, and at the time was wearing clothing quite similar — but not identical — to the description broadcast over the police radio. While the description of the perpetrator mentioned a blue sweatshirt and blue jeans, Officer Bowman testified that the defendant was wearing blue sweatpants, “a navy blue jacket[, and] a darker blue fleece type jacket underneath. He had on two jackets.” Officer Bowman reported to the dispatcher that Askew “vaguely matchfed] th[e] description.” After noticing that the defendant had a mous-tache, Officer Bowman checked with the dispatcher to determine whether the robber also had a moustache. When the dispatcher responded affirmatively, Officer Bowman stopped the defendant.
Officer Bowman asked the defendant to come to the patrol car, and he complied. The defendant also complied with Officer Bowman’s further requests that he produce some identification, take his hands out of his pockets, and place his hands on the top of his head. Officer Bowman then told the defendant that he was being stopped because of his physical similarity to the description of a robber. When back-up units arrived, Officer Bowman returned to the interior of his car to check whether the police department computer returned any information on the defendant. Officer Bowman’s back was turned for the next couple of minutes and he did not see the pat-down of the defendant that followed.
Officer James Koenig conducted a pat-down of the defendant and found nothing. Shortly afterwards, another officer, Officer Benton, drove the robbery victim to the place where the defendant was being detained, for the purpose of conducting a show-up. The victim remained in the car while Officer Koenig and Officer Anthony Willis brought the defendant to a place where he could be seen by the victim. The defendant was not in handcuffs at that time. Preparatory to the show-up, Officer Willis attempted to unzip the defendant’s outer jacket to reveal the sweatshirt underneath so the victim could better determine if the defendant was the robber. Officer Willis testified that he remembered the “blue hooded sweatshirt” described in the radio run and “wanted the complainant to see what [the defendant] had on to make sure that he wasn’t zipping nothing up *1125 to cover up. So I went to unzip it down so that ... they could see what he had on.” Officer Willis had difficulty, however, in unzipping the jacket when the zipper hit what he described as a “hard” or “solid” object and “didn’t go past [the object]. It stopped there. And at that time, that’s when [the defendant] knocked my hand down,” away from the zipper.
After the show-up, Officer Willis and Officer Edward Snead walked the defendant backwards toward the car, placed him on the hood of the car, and unzipped his jacket. Visible once the jacket was unzipped was an open black waist pouch, or “fanny pack,” with a silver object sticking out. On further inspection, the silver object was identified as a gun, and the defendant was handcuffed and arrested.
Askew, 313 F.Supp.2d at 2-3 (alterations in original) (footnotes and transcript citations omitted).
In the course of its legal analysis, the District Court concluded that the disputed unzipping was undertaken to facilitate the show-up. Id. at 4. This conclusion is consistent with its factual findings that Officer Koenig found “nothing” during the frisk and that the complainant was brought to where appellant was detained “shortly af-terwards.” Id. at 3; see also id. at 4. In a footnote, the District Court notes that Officer Koenig did not testify at the suppression hearing. Rather, the testimony regarding the pat down was provided by Officer Willis. Id. at 3 n. 2. (In fact, the motions hearing transcript reveals that the Government, as part of its trial strategy, chose not to put on Officer Koenig. See Mar. 26 Tr. at 21, 24, 38.) In this same footnote, the Court describes Officer Willis’s “suggestion] that Officer Koenig had not completed the pat-down ... when Officer Benton arrived with the robbery victim for a show-up.” Askew, 313 F.Supp.2d at 3 n. 2 (emphasis added). The Court also notes Officer Willis’s testimony that “perhaps ” the pat down had not been completed “because of some resistance by the defendant.” Id. (emphasis added). The Court then points to “[t]he government acknowledge[ment] that when Officer Koe-nig patted the defendant down, he did not find anything” and reiterates its own finding that “[t]he subsequent discovery of the gun at issue was not the result of this pat-down.” Id.; see also id. at 4 (“[t]he initial pat-down by Officer Koenig did not reveal the presence of any weapon”). In other words, the District Court does not credit Officer Willis’s suggestion ■ that the pat down may have been incomplete or Officer Willis’s speculation regarding why that may have been the case.
II. Overview
“Time and again” the Supreme Court “has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well delineated exceptions.” Dickerson, 508 U.S. at 372, 113 S.Ct. 2130 (quotation marks omitted) (collecting cases). And the Court has made it clear that the “inestimable right of personal security” embodied in the Fourth Amendment “belongs as much to the citizen on the streets ... as to the homeowner closeted in his study.... For, as [the Supreme] Court has always recognized, ‘No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.’ ” Terry v. Ohio, 392 U.S. 1, 8-9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (quoting Union Pac. Ry. Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891)).
*1126 In Terry v. Ohio, the Supreme Court defined one of the few exceptions to the prohibition against warrantless searches of a person. The Court held that in the context of a properly justified on-the-street stop, if a police officer has a reasonable articulable suspicion “that the individual whose suspicious behavior, he is investigating at close range is armed and presently dangerous to the officer or to others,” that officer may conduct a limited protective search “to determine whether the person is in fact carrying a weapon.” 392 U.S. at 24, 88 S.Ct. 1868; see also id. at 30-31, 88 S.Ct. 1868. In Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), an opinion issued on the same day as Terry, the Court confirmed the limited nature of the Terry search exception, explicitly stating that the “only goal which might conceivably” justify a search in the context of a Terry stop is a search for weapons. Id. at 65, 88 S.Ct. 1889.
In subsequent cases, the Court has been unequivocal in explaining that “[t]he purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.” Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (emphasis added). Thus, the fruit of a search that “goes beyond what is necessary to determine if [a] suspect is armed ... will be suppressed.” Dickerson, 508 U.S. at 373, 113 S.Ct. 2130 (citing Sibron, 392 U.S. at 65-66, 88 S.Ct. 1889). This is so, the Court explained in Minnesota v. Dickerson, because searches that exceed what is necessary to determine if an individual is armed “amount[] to the sort of evidentiary search that Terry expressly refused to authorize” and that the Court “condemned” in Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1912, 20 L.Ed.2d 917, and Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Dickerson, 508 U.S. at 378, 113 S.Ct. 2130.
Appellant argues that pursuant to this well-established body of law, the unzipping of his jacket was unlawful, because it was not undertaken for protective purposes, but rather amounted to an impermissible evidentiary search unsupported by probable cause or a warrant. The Government, in contrast, asserts that this question is not controlled by Dickerson and the precedent on which Dickerson rests, but rather should be decided through application of the reasonableness balancing test. Under this test, the permissibility of a Government action is determined by “balancing the [governmental] need to search [or seize] against the invasion which the search [or seizure] entails.” Terry, 392 U.S. at 21, 88 S.Ct. 1868 (second and third alteration in original) (quotation marks omitted). Pursuant to this test, the Government argues that because the unzipping of appellant’s jacket “was a reasonable, de minimis investigative measure that appropriately facilitated the show-up procedure,” it need not have been supported by a warrant or probable cause. Gov’t En Banc Br. at 13.
When the Supreme Court has weighed the interests relevant to determining whether a certain type of official conduct is reasonable under the Fourth Amendment, lower courts are not free to strike a new and different balance. With respect to searches of individuals detained during on-the-street encounters on less than probable cause, the balance was struck in Terry, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and Sibron, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917. Employing the reasonableness test to which the Government refers, the Court in Terry authorized a strictly circumscribed search for weapons when an officer has reasonable articulable suspicion to believe that a prop *1127 erly stopped individual is armed and dangerous to the officers or others nearby. 392 U.S. at 30-31, 88 S.Ct. 1868; see also New York v. Class, 475 U.S. 106, 117, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (“When a search or seizure has as its immediate object a search for a weapon, ... we have struck the balance to allow the weighty interest in the safety of police officers to justify warrantless searches based only on a reasonable suspicion of criminal activity.”). The Sibron Court, applying Terry’s holding, made clear that Terry did not permit police officers to undertake searches not justified on a safety rationale. See 392 U.S. at 63-64, 88 S.Ct. 1889. It also established that protective searches that extend beyond the strictly circumscribed bounds of Terry are impermissible evidentiary searches. Id. at 65-66, 88 S.Ct. 1889. Most important, for our purposes, the Court’s opinion in Minnesota v. Dickerson, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334, confirms that when an on-the-street search of an individual who has been stopped on reasonable articulable suspicion extends beyond what is authorized in Terry, there is no reweighing to be undertaken on the grounds that the search might be described as minimally intrusive or that the evidence sought might provide probable cause to believe that the suspect committed the crime in question.
Because there is no principled way to distinguish the initial unzipping in this case from the search in Dickerson, this court is not free to reweigh the interests at issue to create the new and wholly unprecedented identification exception to the warrant and probable cause requirements that the Government urges upon us. Rather, applying the balance that the Supreme Court struck in Terry and Sibron to the uncontested factual findings of the District Court, we are convinced that the unzipping of appellant’s jacket was a non-protective evidentiary search that violated the Fourth Amendment.
III. Analysis of the Legal Issues
A. The Partial Unzipping and Opening of Appellant’s Jacket Was a Search
Before turning to the issues before the en banc court, we must determine whether the unzipping of appellant’s jacket was, in fact, a search. Clearly it was. By zipping up his jacket, appellant unquestionably evidenced an intent to keep private whatever lay under it. The only question, then, is whether society is prepared to recognize such an expectation as reasonable. See Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).
This question was unequivocally answered by the Supreme Court in Terry. At issue there was the touching of the outer surface of the defendant’s overcoat. Terry, 392 U.S. at 7, 88 S.Ct. 1868. As the Court explained, even that limited action rose to the level of a “search” within the purview of the Fourth Amendment. Id. at 16, 88 S.Ct. 1868. Because the opening of a fastened coat, like the opening of most other clothing, renders visible whatever lies underneath, such an action involves an even greater intrusion in precisely the same socially recognized expectation of privacy. And such an intrusion is particularly great when, as here, the opening takes place on a public street. In describing the level of personal intrusion occasioned by a public frisk, the Terry Court stated:
[I]t is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a “petty indignity.” It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment.
Id. at 16-17, 88 S.Ct. 1868. The undoing of clothing to reveal whatever is under *1128 neath to whomever happens to be on the street necessarily involves an even more serious intrusion upon the sanctity of the person. The involuntary opening of someone’s clothing reveals to the world at large (not just to the searching police officer) what an individual obviously intends to keep private.
As noted above, the Government did not dispute the characterization of the unzipping as a search during arguments before the panel. Before the en banc court, however, the Government refused to concede the point. Stating that it was only “assuming], arguendo, that the unzipping of appellant’s jacket was a ‘search,’ ” Gov’t En Banc Br. at 23 n. 11, the Government maintained that the police action did not actually amount to a search because the sweatshirt that the police expected to reveal “presumably was widely visible when appellant was in indoor settings.” Id. This argument is flawed in both its legal and factual premises.
Relying primarily on United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), the Government likens appellant’s sweatshirt to a “physical characteristic ... constantly exposed to the public.” Gov’t En Banc Br. at 23 n. 11 (omissions in original). This analogy is inapt. In Dionisio, the Supreme Court held that production of a voice exemplar pursuant to a grand jury subpoena did not constitute a search, because “[t]he physical characteristics of a person’s voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public. Like a man’s facial characteristics, or handwriting, his voice is repeatedly produced for others to hear.” 410 U.S. at 14, 93 S.Ct. 764. As the Court explained, “while the content of a communication is entitled to Fourth Amendment protection ... the underlying identifying characteristics — the constant factor throughout both public and private communications — are open for all to see or hear.” Id. (quotation marks omitted) (omission in original). Consequently, “[n]o person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world.” Id.
The same cannot be said of a piece of clothing when the only information that the police have about that clothing is that the wearer has chosen to shield most of it from public view. Contrary to the Government’s assertion, there is nothing about a sweatshirt that — like the characteristics of an individual’s voice, handwriting, or face — must necessarily be revealed to the public in the course of daily life. An individual may choose to expose all or part of an article of clothing to the public or he may choose to keep all or part of that clothing covered.
The only evidence presented by the Government regarding appellant’s sweatshirt was that appellant had demonstrated an intent to shield most of it from public view. When a government agent unfastens, lifts, pulls down, pats, or otherwise manipulates clothing to reveal or determine what lies underneath, that manipulation necessarily involves the sort of “ ‘probing into an individual’s private life’” that the Court in Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), characterized as the mark of a search or interrogation. Dionisio, 410 U.S. at 15, 93 S.Ct. 764 (quoting Davis v. Mississippi). Citing Terry, the Dionisio Court reiterated that even the minimal intrusion involved in a Terry frisk of outer clothing necessarily amounts to a Fourth Amendment search. Contrasting the seizure of voice exemplars to permissible Terry pat downs, the Court explained that the former “does not involve the severe, though brief, intrusion upon cherished personal security, effected *1129 by” the latter. Dionisio, 410 U.S. at 15, 93 S.Ct. 764 (quotation marks omitted).
The Government’s argument that the unzipping of appellant’s jacket was not a search is also based on fundamentally flawed factual premises. First, the Government assumes that the unzipping of appellant’s jacket would reveal only appellant’s already partially visible sweatshirt. One need only consider the special medical needs of certain individuals, including those who are forced to use colostomy bags and heart monitors (to name a few) to recognize the fallacy of this assumption. Such devices frequently are attached to an individual’s abdominal area and often require those wearing them to hike up the clothing around their midsection to accommodate the device. Second, many individuals wear clothing that is comfortable to them but would appear unseemly to others. In such circumstances, the individual who does not want the unseemly portions of his clothing publicly exposed will cover or partially cover that clothing with another garment. Appellant’s fastening of his jacket effectively expressed a recognized and reasonable expectation of privacy. And its unfastening cannot be characterized as a non-search given the inability of the police to know what other information pertaining to appellant’s private life that unfastening would reveal.
B. Minnesota v. Dickerson Dictates the Conclusion That the Unzipping of Appellant’s Jacket Was an Impermissible Search for Evidence
The legal principles controlling the disposition of this case were largely established in three post-Terry Supreme Court cases, all of which were relied on by the Court in Minnesota v. Dickerson. Those cases are Sibron, 392 U.S. 40, 88 S.Ct. 1889; Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); and Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201. Discussing and applying Terry, each makes clear that in the context of an on-the-street seizure based on less than probable cause, there is no balancing of interests to be undertaken in determining whether a particular search of a stopped suspect is reasonable and therefore permissible under the Fourth Amendment. Rather, applying the balance struck in Terry, courts are constrained to suppress evidence obtained during such a stop if it is the fruit of a search that was not necessary to protect the investigating officers or others nearby. Put another way, these decisions establish that individuals stopped on no more than reasonable articulable suspicion may not, consonant with the protections of the Fourth Amendment, be searched for the purpose of revealing and gathering evidence pertaining to the illegal behavior of which they are suspected.
Sibron, a companion case to Terry, clarified the limits of the search exception authorized in Terry, holding that a non-protective evidentiary search of an individual detained on less than probable cause, would not pass Fourth Amendment muster. In that case, a police officer stopped Sibron on suspicion that he was selling narcotics. See 392 U.S. at 45, 88 S.Ct. 1889. When the officer said to Sibron, “You know what I am after,” Sibron “mumbled something and reached into his pocket. Simultaneously, [the officer] thrust his hand into the same pocket” discovering several envelopes of heroin. Id. (quotation marks omitted). After first concluding that the officer lacked probable cause to arrest Sibron when he stopped him, id. at 62-63, 88 S.Ct. 1889, the Court held that the search of Sibron’s pocket for evidence of narcotics was unconstitutional. Relying on its decision in Terry, the Court concluded that the officer’s action was not predicated on any concern that Sibron was armed, but rather constituted a search for evidence of the crime that the officer sus *1130 pected Sibron of committing. See id. at 63-64, 88 S.Ct. 1889. As the Court described it, the officer’s “opening statement to Sibron ... made it abundantly clear that he sought narcotics, and his testimony at the hearing left no doubt that he thought there were narcotics in Sibron’s pocket.” Id. at 64, 88 S.Ct. 1889. Moreover, as the Court explained, even if the search had been predicated on a reasonable articulable suspicion that Sibron was armed, the search would have been impermissible because it “was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception — the protection of the officer by disarming a potentially dangerous man.” Id. at 65, 88 S.Ct. 1889 (emphasis added).
In Ybarra, the Court reiterated the limits of its Terry search rationale. The search at issue there took place in the Aurora Tap Tavern. 444 U.S. at 88, 100 S.Ct. 338. The police had obtained a warrant authorizing the search of the tavern and an individual named Greg. Id. Upon entering the tavern, the officers frisked each of its patrons for weapons. Id. During the frisk of Ybarra, an “officer felt what he described as a cigarette pack with objects in it.” Id. at 88, 100 S.Ct. 338 (quotation marks omitted). After completing the pat down of a number of other patrons, the officer returned to Ybarra, frisked him again, and removed from his shirt pocket a cigarette pack containing what turned out to be packets of heroin. Id. at 89, 100 S.Ct. 338. The State argued, inter alia, that the first pat down of Ybar-ra was a permissible frisk for weapons under Terry. Id. at 92, 88 S.Ct. 1868. The Court rejected the State’s argument, concluding that because “[t]he initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous,” id. at 92-93, 100 S.Ct. 338, the evidence must be suppressed. As the Court explained, “[t]he Terry case created an exception to the requirement of probable cause, an exception whose narrow scope this Court has been careful to maintain. Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted.” Id. at 93, 100 S.Ct. 338 (emphasis added) (quotation marks omitted). However, the Court was careful to point out that “[n]oth-ing in Terry can be understood to allow a generalized ‘cursory search for weapons’ or, indeed, any search whatever for anything but weapons.” Id. at 93-94, 100 S.Ct. 338 (emphasis added).
In Long, which extended Terry’s protective search doctrine to the interior of cars, the Court confirmed and explained its unwillingness to allow non-protective eviden-tiary searches based on less than probable cause during run-of-the-mill investigatory stops. The Court there addressed the constitutionality of the search of the interi- or compartment of an automobile during a lawful investigatory stop of its occupant. 463 U.S. at 1037, 103 S.Ct. 3469. Quoting Terry, the Court concluded “that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on ‘specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant’ the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.” Id. at 1049, 103 S.Ct. 3469. The Court “stress[ed],” however, that its decision did “not mean that the police may conduct automobile searches whenever they conduct an investigative stop.” Id. at n. 14, 103 S.Ct. 3469 (emphasis in original). As the Court explained, this is because the justification for allowing automatic war- *1131 rantless searches for evidence incident to an arrest does not support an automatic warrantless evidentiary search during a Terry stop. See id.
An additional interest exists in the arrest context, ie., preservation of evidence, and this justifies an “automatic” search. However, that additional interest does not exist in the Terry context. A Terry search, “unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime.... The sole justification of the search ... is the protection of police officers and others nearby.”
Id. (quoting Terry, 392 U.S. at 21, 88 S.Ct. 1868) (alterations in original).
Relying on the rationale of these cases, the Court in Minnesota v. Dickerson again confirmed that non-protective evidentiary searches are not permissible during Terry stops. There, on facts essentially indistinguishable from those presented here, the Supreme Court held that a police officer violated the Fourth Amendment proscription against unreasonable searches when, following a protective frisk that produced no evidence of a weapon, he manipulated the outside of a suspect’s jacket pocket in an effort to identify as crack cocaine a small lump detected during the frisk. 508 U.S. at 378-79, 113 S.Ct. 2130. Dickerson first came to the attention of the searching officer and his partner when he left what was a well-known crack house. Id. at 368, 113 S.Ct. 2130. “According to testimony credited by the trial court, [Dickerson] began walking toward the police but, upon spotting the squad car and making eye contact with one of the officers, abruptly halted and began walking in the opposite direction.” Id. at 368-69, 113 S.Ct. 2130. Based on these “evasive actions and the fact that he had just left a building known for cocaine traffic, the officers decided to ... investigate further.” Id. at 369, 113 S.Ct. 2130. They stopped Dickerson and patted him down for weapons. Id. Although the pat down revealed no weapons, “the officer conducting the search did take an interest in a small lump in respondent’s nylon jacket.” Id. The officer, who did not immediately recognize the lump as crack cocaine, determined what it was only after “squeezing, sliding and otherwise manipulating the contents of the defendant’s pocket.” Id. at 378, 113 S.Ct. 2130 (quotation marks omitted).
The Supreme Court granted certiorari in Dickerson “to resolve a conflict among the state and federal courts over whether contraband detected through the sense of touch during a patdown search may be admitted into evidence.” Id. at 371, 113 S.Ct. 2130. In essence, the issue before the Court was whether and when the plain view doctrine of Arizona v. Hicks, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), could justify a plain feel exception for nonthreatening evidence detected during a Terry pat down.
Citing and discussing Sibron, Ybarra, and Long, the Court first reviewed the hmits on searches conducted during Terry stops, Dickerson, 508 U.S. at 372-73, 113 S.Ct. 2130, concluding with the long “settled” principle that if a “protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed,” id. at 373, 113 S.Ct. 2130. Turning to the plain view doctrine, the Court explained that “if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.” Id. at 375, 113 S.Ct. 2130. However, the Court continued, if “the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object — ie., if *1132 ‘its incriminating character [is not] immediately apparent,’ the plain-view doctrine cannot justify its seizure.” Id. (alteration in original) (citations omitted).
Applying these principles to nonthreatening contraband discovered during Terry pat downs, the Court concluded that a warrantless seizure would be permissible “so long as the officers’ search stays within the bounds marked by Terry,” id. at 373, 113 S.Ct. 2130 (emphasis added), and the object’s “contour or mass makes its identity immediately apparent,” id. at 375, 113 S.Ct. 2130 (emphasis added).
In addressing the facts before it, the Dickerson Court described the “dispositive question” as “whether the officer who conducted the search was acting within the lawful bounds marked by Terry at the time he gained probable cause to believe that the lump in respondent’s jacket was contraband.” Id. at 377, 113 S.Ct. 2130. Answering that question in the negative, the Court concluded that the “officer’s continued exploration of respondent’s pocket after having concluded that it contained no weapon was unrelated to ‘[t]he sole justification of the search [under Terry: ] ... the protection of the police officer and others nearby.’ ” Id. at 378, 113 S.Ct. 2130 (quoting Terry, 392 U.S. at 29, 88 S.Ct. 1868) (alterations in original). Thus, the Court found that the manipulation of appellant’s pocket “amounted to the sort of evidentiary search that Terry expressly refused to authorize, see [392 U.S.] at 26 [88 S.Ct. 1868], and that we have condemned in” Sibron, 392 U.S. at 65-66, 88 S.Ct. 1889, and Long, 463 U.S. at 1049 n. 14, 103 S.Ct. 3469. Dickerson, 508 U.S. at 378, 113 S.Ct. 2130.
“Once again,” the Court explained, “analogy to the plain-view doctrine is apt.” Id.
In Arizona v. Hicks, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), this Court held invalid the seizure of stolen stereo equipment found by police while executing a valid search for other evidence. Although the police were lawfully on the premises, they obtained probable cause to believe that the stereo equipment was contraband only after moving the equipment to permit officers to read its serial numbers. The subsequent seizure of the equipment could not be justified by the plain-view doctrine, this Court explained, because the incriminating character of the stereo equipment was not immediately apparent; rather, probable cause to believe that the equipment was stolen arose only as a result of a further search — the moving of the equipment — that was not authorized by a search warrant or by any exception to the warrant requirement.
Dickerson, 508 U.S. at 378-79, 113 S.Ct. 2130. Concluding that the search of Dickerson was “very similar” to the search of the stereo equipment, id. at 379, 113 S.Ct. 2130, the Court held that the disputed search of Dickerson’s pocket was unconstitutional.
Although the officer was lawfully in a position to feel the lump in respondent’s pocket, because Terry entitled him to place his hands upon respondent’s jacket, the court below determined that the incriminating character of the object was not immediately apparent to him. Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by Terry or by any other exception to the warrant requirement. Because this further search of respondent’s pocket was constitutionally invalid, the seizure of the cocaine that followed is likewise unconstitutional.

Id.

The disputed search of appellant in this case cannot be distinguished in any *1133 meaningful way from the impermissible search in Dickerson. Here, as in Dickerson, neither the constitutionality of the initial stop nor the protective frisk was at issue. In addition, neither the frisk of Dickerson nor the frisk of appellant produced any evidence of a weapon. Nevertheless, in each case, the police undertook a further search aimed at determining whether certain physical evidence would identify the stopped individual as the perpetrator of the crime in question. In Dickerson, the police officer manipulated the outside of the suspect’s jacket pocket to determine whether the small lump in that pocket felt like crack cocaine. Here, the police manipulated appellant’s jacket, partially unzipping and opening it, so that the complainant could see the sweatshirt underneath appellant’s jacket. In each case, the goal of the officer was to obtain information about a physical object in the suspect’s possession that the officer believed might identify the suspect as having committed the crime in question. In other words, the officer’s goal in each case was to determine whether the object of the search, the lump in Dickerson and the sweatshirt here, had particular incriminating characteristics that would contribute to a probable cause determination. And in each case, the officer sought to accomplish this goal pursuant to a search that exceeded the bounds of Terry.
The Government’s attempt to distinguish Dickerson is entirely unavailing. The sum and total of the Government’s argument consists of a single sentence:
This case is critically different from Dickerson, because this case does not involve an intrusive search of the person for evidence, but rather involves the very minimal intrusion of partially unzipping a coat to reveal a sweatshirt, not as part of a general search for evidence, but rather as a reasonable incident of an entirely permissible show-up identification procedure.
Gov’t En Banc Br. at 38-39. This bald assertion is unsupported by any further explanation and is quite wrong in what it suggests.
The assertion that the impermissible search of Dickerson was more intrusive than the search of appellant is specious. If anything, the search of appellant was more intrusive. First, as the Supreme Court pointed out, when the officer in Dickerson undertook the impermissible search, he was at least “lawfully in a position to feel the lump in [Dickerson’s] pocket,” having just finished a pat down. 508 U.S. at 379, 113 S.Ct. 2130. Moreover, throughout the search in Dickerson, the officer never strayed from the outside surface of the suspect’s jacket pocket. He did not open the pocket. He did not look into it. And he did not reach inside the jacket to feel the pocket’s contents. Thus, while the officer in Dickerson felt the lump through the jacket pocket, he did not physically penetrate the outer surface of the jacket. Rather, he simply “squeezed], slid[], and otherwise manipulated] the contents of the defendant’s pocket.” Id. at 378, 113 S.Ct. 2130 (quotation marks omitted). And, significantly, his actions did not reveal the contents of the pocket to the public at large.
Here, when Officer Willis unzipped to the waist appellant’s fastened jacket so that the complainant could see what was underneath, he not only penetrated the outer layer of appellant’s clothing, he actually physically peeled a portion of it back. In contrast to the officer in Dickerson, Officer Willis also exposed what lay under that outer layer to the public at large. Consequently, in addition to exposing the sweatshirt to the complainant, the search of appellant’s jacket necessarily exposed whatever else appellant had under that portion of his jacket to whomever was present on or looking at the street when *1134 his jacket was unzipped. The search here thus involved a greater invasion of the person than the manipulation of the outer surface of Dickerson’s jacket pocket.
The Government’s second distinction, that the search of Dickerson was a “general search for evidence,” while the unzipping of appellant’s jacket was “a reasonable incident of an entirely permissible show-up identification procedure,” Gov’t En Banc Br. at 39, is, at best, puzzling. When pressed at oral argument regarding this alleged distinction between what the police were searching for in Dickerson and what they were searching for here, Government counsel asserted that the search of appellant was different from the search of Dickerson, because the search of Dickerson was a “full-blown evidentiary search,” Tr. of En Banc Argument (Oct. 11, 2007) at 44, “a pure evidentiary search for contraband,” id. at 43. In contrast, according to counsel, the officers here “weren’t trying to recover physical evidence.” Id. at 43; see also id. at 45.
The Government’s argument is unpersuasive. Certainly if the complainant had identified the appellant as her assailant on the basis of his sweatshirt, that sweatshirt would have been seized as physical evidence of appellant’s guilt. Moreover, it is clear that the search here was intended to reveal evidence — both physical evidence (the sweatshirt) and testimonial evidence (the complaint’s identification of it) — that would either support the probable cause necessary to arrest appellant or dispel the officer’s reasonable suspicion that appellant was the robber. It is simply impossible for us to ascertain how that differs from the Dickerson officer’s attempt to uncover tactile evidence regarding the lump in the suspect’s pocket that would support the probable cause necessary to effectuate an arrest or dispel the officer’s suspicion that Dickerson was committing a narcotics offense.
C. The Government’s Arguments for an Investigative Identiñcation Search Exception Are Not Supported by Precedent
There is no Supreme Court or federal appellate ease law supporting the search of an individual stopped only on reasonable articulable suspicion after a pat down of that individual has produced no evidence of a weapon. At oral argument, Government counsel conceded that there is no such precedent. Tr. of En Banc Argument at 51-52.
Absent such precedent, the Government attempts a three-part argument in support of a wholly new investigative identification search exception to the warrant and probable cause requirements. First, it points to cases in which the Supreme Court has used the balancing test to assess the Fourth Amendment permissibility of what the Government characterizes as “a wide array” of warrantless “governmental intrusions based on something less than probable cause.” Gov’t En Banc Br. at 19-21. Second, it seeks support in several Supreme Court cases indicating that “police officers may take reasonable steps necessary to facilitate a brief investigation during a Terry stop.” Id. at 21-22. Third, it asserts that the Supreme Court has approved investigative measures, similar to the unzipping of appellant’s jacket, that are related to identification issues. Id. at 24-28. None of the cited cases, either singularly or in combination, support the permissibility of the non-protective eviden-tiary search at issue here.
1. The “Balancing-Test” Cases Do Not Support an Investigative Identification Search Exception
Unsurprisingly, given the Court’s pronouncements in Dickerson and Sibron, none of the balancing-test cases cited by the Government involve the permissibility *1135 of a search during a run-of-the-mill Terry stop. Rather, the cited cases fall into one of three categories, each of which is irrelevant to the issue here.
In one category, the Court relies on the balancing test to extend Terry’s safety rationale to new and limited settings. See, e.g., Maryland v. Buie, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (a “protective sweep ... incident to an arrest” does not violate the Fourth Amendment “if the searching officer possessed] a reasonable belief ... that the area swept harbor[s] an individual posing a danger to the officer or others”); Pennsylvania v. Mimms, 434 U.S. 106, 110-11, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (“inordinate risk confronting an officer” justifies requiring a driver who is stopped for traffic violation to step out of the car).
In the second category, the Court uses the balancing test to assess the permissibility of searches of individuals who have a lessened expectation of privacy as a result of governmental supervision to which they were legitimately subject at the time of the search. See, e.g., United States v. Knights, 534 U.S. 112, 119-22, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (defendant’s “status as a probationer subject to a search condition” results in a diminished expectation of privacy that does not outweigh governmental interest in crime prevention and rehabilitation); O’Connor v. Ortega, 480 U.S. 709, 725-26, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (“Balanced against the substantial government interests” of public employers, “the privacy interests of government employees in their place of work ... are far less than those found at home or in some other contexts.”); New Jersey v. T.L.O., 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (“[T]he accommodation of the privacy interests of school children with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student [in a public school] should depend simply on the reasonableness, under all the circumstances, of the search.”).
The remainder of the cases relied on by the Government to support its assertion that the reasonableness balancing test provides the means by which we should assess the unzipping of appellant’s jacket are inapt in that they do not involve searches. Rather, these cases simply stand for the proposition that, in certain situations, a seizure — if limited enough in scope — may be found reasonable though based on something other than probable cause to believe that criminal activity is afoot. See, e.g., Illinois v. Lidster, 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004) (highway checkpoint to locate a hit and run driver found reasonable because contact with police — which consisted of a request for information and the distribution of a flyer— lasted no more than a few seconds and did not involve a search for evidence); United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (seizure of luggage based on reasonable articulable suspicion that it contains narcotics may be permissible if detention is limited in duration and investigative measures used to confirm or dispel suspicion do not include a search of contents); United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (highway checkpoints at border requiring vehicle occupants to respond to brief questions and possibly produce documents evidencing a right to be in the United States found reasonable where neither the vehicle nor its occupants were searched).
Clearly none of these cases support the Government’s argument that the unzipping *1136 of appellant’s jacket was “a reasonable, de minimis investigative measure that appropriately facilitated the show-up procedure.” Gov’t En Banc Br. at 13. The first set of cases merely allows for limited intrusions carefully tailored to reveal or eliminate an officer’s reasonable articula-ble suspicion that a person or place poses a danger to himself or others nearby. The inapplicability of the second set of cases is easily demonstrated by considering how any one of the defendants in those cases would have been treated had they not legitimately been subject to increased governmental supervision. For example, had the fourteen-year-old public school student in T.L.O. left school property, it is clear that no police officer could have permissibly searched her purse merely because she had been seen smoking in the school lavatory. The third set of cases is similarly wholly irrelevant to the issue before us in that none of the cases involve a search of any kind.
2. Cases Indicating that Police Officers May Take Certain Steps to Facilitate a Brief Investigation During a Terry Stop Do Not Support an Identification Search Exception
None of the cases on which the Government relies to support its second premise — that police officers may take reasonable steps necessary to facilitate a brief investigation during a Terry stop — lend support to its ultimate conclusion that the unzipping here was a permissible investigative step. This is because none of the permissible investigatory measures in the cases cited by the Government involved an evidentiary search. As described in Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), permissible investigative measures in the context of a Terry stop consist of questioning (which may include a request for identification or inquiry concerning the suspicious conduct of the person detained); communication with police or private citizens to verify explanations, confirm identification, or determine whether a person of the proffered identity is otherwise wanted; a short detention while police check premises and talk to others to determine whether, in fact, an offense has occurred; the examination of objects abandoned by the suspect; and, if it is known that an offense was committed in the area, the viewing of the suspect by witnesses to the crime. Id. at 700 n. 12, 101 S.Ct. 2587.
The only additional investigative steps referenced by the Government are those related to the seizure of a traveler’s baggage permitted when an officer has reasonable articulable suspicion to believe that it contains narcotics. See Gov’t En Banc Br. at 22 (citing Place, 462 U.S. at 703-04, 103 S.Ct. 2637). In Place, though, the Court was careful to point out that if the investigative procedure for which luggage is seized is “itself a search requiring probable cause, the initial seizure of [the] luggage ... — no matter how brief — [can]not be justified on less than probable cause.” 462 U.S. at 706, 103 S.Ct. 2637. The Court went on to explain that the dog sniff test for narcotics, to which Place’s luggage was subject, was not a search, because it neither required that the luggage be opened, nor exposed non-contraband items that otherwise would have remained shielded from public view. Id. at 707, 103 S.Ct. 2637. Because the unzipping here was a search, Place supports the conclusion that the unzipping of appellant’s jacket was not a permissible investigative measure.
3. The Investigative Measures Cases Pertaining to Identification Issues Provide No Support for the Government’s Identification Search Exception
The Government principally relies on four cases in support of its argument that *1137 searches narrowly tailored to facilitate a show-up procedure are permissible investigative measures. One of those cases, New York v. Class, 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986), is not only distinguishable, but actually supports the opposite of what the Government claims. Two others, United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), and United States v. Mara, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973), lend no support whatsoever to the Government’s argument, because they involved neither a search nor an investigative step taken in the context of a Terry stop. That leaves the dicta in Hayes v. Florida, 470 U.S. 811, 816-17, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985). And the language in Hayes to which the Government points simply cannot take the Government where it needs to go to prevail on the facts presented here.
a. Class Supports the Exclusion of the Gun Evidence
In Class, the Supreme Court determined that a police officer conducted a search when, during a traffic stop, he reached into the defendant’s vehicle to move some papers that obscured the vehicle identification number (VIN) on the dashboard. 475 U.S. at 114-15, 106 S.Ct. 960. In so doing, the officer saw a gun under the driver’s seat. Id. at 108, 106 S.Ct. 960. As described by the Government in its en banc brief, “[t]he Supreme Court concluded that the officer’s actions were reasonable, after applying a ‘balancing’ test that considered, among other things, that ‘the search was focused on its objective [of revealing the VIN] and no more intrusive than necessary to fulfill that objective;’ and that the search was ‘far less intrusive than a formal arrest.’ ” Gov’t En Banc Br. at 27-28 (quoting Class, 475 U.S. at 118, 106 S.Ct. 960) (alterations in original). “Thus,” according to the Government, Class approved a limited investigative search “similar” to the unzipping of appellant’s jacket, “without requiring probable cause.” Gov’t En Banc Br. at 28. The Government’s characterization badly distorts the Court’s reasoning and is simply wrong in its conclusion.
The Class opinion, in fact, rests on three factors — the impossibility of having a reasonable expectation of privacy in a VIN, officer safety, and the existence of probable cause — that not only render the balance struck there inapplicable to the case here, but actually support the conclusion that the unzipping of appellant’s jacket was impermissible. Because there is no expectation of privacy in VINs, the intrusion at issue in Class was not the moving of the papers covering the VIN, but rather the officer’s reach into the car to move those papers. See Class, 475 U.S. at 114-15, 106 S.Ct. 960. The inquiry was made necessary by the fact that the officer had prevented the respondent, who had alighted from his car when the police pulled him over, from getting back into the car to move the papers. See id. at 115, 106 S.Ct. 960. Noting that under Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331, safety concerns permitted the officer to detain the driver outside of the car, the Court explained that the question at issue was whether the officer additionally could “effect a search for the VIN that may have been necessary only because of that detention.” Class, 475 U.S. at 116, 106 S.Ct. 960.
The Court concluded that the search was permissible. It said: “In light of the danger to the officers’ safety that would have been presented by returning respondent immediately to his car, we think the search to obtain the VIN was not prohibited by the Fourth Amendment.” Id. However, in describing the balancing by which it reached this conclusion, the Court made clear that because the safety concern at issue arose not from a particularized belief *1138 that the respondent had a weapon, but rather from the more generalized concern for officer safety that motivated the Court in Mimms, id. at 115-16, 98 S.Ct. 330, the Government was required to demonstrate some probable cause focusing suspicion on the individual affected by the search. Id. at 117-18, 98 S.Ct. 330. The Court explained:
When a search or seizure has as its immediate object a search for a weapon, ... we have struck the balance to allow the weighty interest in the safety of police officers to justify warrantless searches based only on a reasonable suspicion of criminal activity. See Terry v. Ohio, [392 U.S. at 21, 88 S.Ct. 1868]; Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Such searches are permissible despite their substantial intrusiveness. See Terry v. Ohio, [392 U.S. at] 24-25 [88 S.Ct. 1868] (search was “a severe, though brief, intrusion upon cherished personal security, and ... must surely [have] b[een] an annoying, frightening, and perhaps humiliating experience”).
When the officer’s safety is less directly served by the detention, something more than objectively justifiable suspicion is necessary to justify the intrusion if the balance is to tip in favor of the legality of the governmental intrusion. In Pennsylvania v. Mimms, [434 U.S.] at 107 [98 S.Ct. 330], the officers had personally observed the seized individual in the commission of a traffic offense before requesting that he exit his vehicle. In Michigan v. Summers, 452 U.S. 692, 693, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the officers had obtained a warrant to search the house that the person seized was leaving when they came upon him.
Id. at 117, 98 S.Ct. 330 (parenthetical alterations in original).
Although the Class Court acknowledged the difference between the facts before it and the facts in Mimms and Summers, it concluded that the balance struck in those cases supported the permissibility of the officer’s intrusion into the car in the case before it. Id. at 117-18, 106 S.Ct. 960. As the Court explained: “All three of the factors involved in Mimms and Summers are present in this case: [1] the safety of the officers was served by the governmental intrusion; [2] the intrusion was minimal; and [3] the search stemmed from some probable cause focusing suspicion on the individual affected by the search. Indeed, here the officers’ probable cause stemmed from directly observing respondent commit a violation of the law,” which, the Court noted, would have justified his arrest. Id. at 118, 106 S.Ct. 960 (emphasis added).
The Class Court thus held that the officer’s search for the VIN number “was sufficiently unintrusive to be constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations. Any other conclusion,” the Court found, “would expose police officers to potentially grave risks without significantly reducing the intrusiveness of the ultimate conduct — viewing the VIN — which ... the officers were entitled to do as part of an undoubtedly justified traffic stop.” Id. at 119,106 S.Ct. 960 (emphasis added).
Here, in contrast, there was no officer safety interest served by the unzipping. The officers did not have probable cause focusing suspicion on appellant, but rather only a reasonable suspicion of criminal activity, which the Class opinion makes clear cannot justify a search that does not have a weapon as its “immediate object.” See id. at 117, 106 S.Ct. 960. And, perhaps most important, appellant clearly had a *1139 reasonable expectation of privacy in what lay underneath his jacket. The objective of the search was not, in other words, to reveal an object in which no one can have a reasonable expectation of privacy.
b. Dionisio and Mara, Which Involved Grand Jury Subpoenas for Evidence in Which There Was No Reasonable Expectation of Privacy, Are Inappo-site
Dionisio and Mara also lend no support to the Government’s claim, because neither case involved a search or a police action during an on-the-street Terry stop. Rather, both decisions addressed the permissibility of grand jury subpoenas seeking evidence in which there can be no expectation of privacy. In Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67, the Court considered the permissibility of a subpoena requiring an individual to produce a voice exemplar for comparison to certain incriminating tapes. In Mara, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99, it examined the permissibility of a subpoena to compel production of a potentially incriminating handwriting exemplar. In Dionisio, the Court first concluded that a grand jury subpoena, unlike a Terry detention, is not a Fourth Amendment seizure. 410 U.S. at 9, 93 S.Ct. 764. The Court held that this was so, at least in part, because grand jury subpoenas are subject to judicial supervision and do not involve the same type of often forceful and demeaning compulsion as investigative stops and arrests. Id. at 9-10, 93 S.Ct. 764. The Court then explained that production of a voice exemplar is not a search, since no individual can have a reasonable expectation of privacy in the physical characteristics of his tone of voice. Id. at 14, 93 S.Ct. 764. “Like a man’s facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world.” Id.; see also Mara, 410 U.S. at 21, 93 S.Ct. 774 (“Handwriting, like speech, is repeatedly shown to the public, and there is no more expectation of privacy in the physical characteristics of a person’s script than there is in the tone of his voice.”).
The same cannot be said of a piece of clothing when the only information that the police have about that clothing is that the wearer has chosen to shield most of it from public view. A sweatshirt, unlike an individual’s tone of voice, handwriting, or facial characteristics, is not invariably revealed to the public in the course of a person’s daily life.
c. The Hayes v. Florida Dicta Does Not Extend to Investigative Measures Involving Searches
The dicta in Hayes v. Florida provides no support for the unzipping of appellant’s jacket. In Hayes, the Court held that the police may not transport a suspect to the police station for fingerprinting without probable cause. The dicta to which the Government points merely suggests that “a brief detention in the field for the purpose of fingerprinting” may be permissible “where there is only reasonable suspicion not amounting to probable cause.” 470 U.S. at 816, 105 S.Ct. 1643. The Court made it clear, however, that such an investigative action might be permissible only so long as (1) “there is reasonable suspicion that the [stopped] suspect has committed a criminal act” (in other words, so long as there is reasonable articulable suspicion justifying the stop of the suspect), (2) “there is a reasonable basis for believing that fingerprinting will establish or negate the suspect’s connection with that crime,” and (3) “the procedure is carried out with dispatch.” Id. at 817, 105 S.Ct. 1643. In support of these criteria, the *1140 Court cited to United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).
In Place, the Court determined that the seizure of a traveler’s luggage on less than probable cause may be reasonable so long as the “observations [of the seizing officer] lead him reasonably to believe that ... [the] luggage ... contains narcotics,” 462 U.S. at 706, 103 S.Ct. 2637, and the detention is brief, id. at 707-10, 103 S.Ct. 2637. Most important, for purposes of the issue before this court, the Place opinion made it clear that when a seizure is based on less than probable cause, the accompanying investigative methods may not include a search. As the Court explained:
Obviously, if [the] investigative procedure [at issue here — a dog sniff — •] is itself a search requiring probable cause, the initial seizure [of the luggage] for the purpose of subjecting it to the sniff test — no matter how brief — could not be justified on less than probable cause.
Id. at 706, 103 S.Ct. 2637. The Court went on to find that dog sniff tests are not searches because they (1) do not require the opening of luggage and thus do not expose to public view non-contraband items that would otherwise remain hidden and (2) do not reveal to authorities any information about the contents of a piece of luggage beyond the presence or absence of illegal narcotics. Id. at 707, 103 S.Ct. 2637. “In these respects,” the Court concluded, “the canine sniff is sui generis. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.” Id.
In Cupp v. Murphy, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), the Supreme Court had earlier indicated that fingerprinting is another investigative measure that, like a dog sniff, is not a search requiring probable cause. The Court there distinguished fingerprinting from the taking of fingernail scrapings:
Unlike the fingerprinting in Davis, the voice exemplar obtained in United States v. Dionisio, [410 U.S. 1, 93 S.Ct. 764], or the handwriting exemplar obtained in United States v. Mara, 410 U.S. 19 [93 S.Ct. 774], the search of the respondent’s fingernails went beyond mere “physical characteristics ... constantly exposed to the public.”
Id. at 295, 93 S.Ct. 2000 (quoting United States v. Dionisio, 410 U.S. at 14, 93 S.Ct. 764) (alterations in original). Cupp thus relied on the Court’s suggestion in Davis v. Mississippi that fingerprinting is not a search, because it “involves none of the probing into an individual’s private life and thoughts that marks an interrogation or search.” Davis, 394 U.S. at 727, 89 S.Ct. 1394. Describing the holding in Davis, the Hayes Court used virtually the same language. See 470 U.S. at 814, 105 S.Ct. 1643 (“fingerprinting, because it involves neither repeated harassment nor any of the probing into private life and thoughts that often marks interrogation and search, represents a much less serious intrusion upon personal security than other types of searches and detentions”).
Clearly, because the investigative method employed in this case — the unzipping of appellant’s jacket — did constitute a search, it cannot be permissible under the criteria set forth in Hayes, Place, and Cupp.
D. Even if the Hayes Dicta Could Be Read to Allow Certain Searches, It Cannot Support the Unzipping of Appellant’s Jacket Because There Was No Reasonable Basis for Believing That the Unzipping Would Establish Or Negate Appellant’s Connection to the Robbery Under Investigation
Even assuming, arguendo, that the Hayes dicta might permit the police to *1141 unzip a suspect’s jacket to facilitate a show-up if, inter alia, “there is a reasonable basis for believing” that doing so “will establish or negate the suspect’s connection with th[e] crime” under investigation, Hayes, 470 U.S. at 817, 105 S.Ct. 1648, the unzipping in this case would not qualify. There is nothing in the record to suggest that the police had a reasonable basis for believing the complainant’s viewing of the generic blue sweatshirt worn by appellant would establish or negate his connection with the robbery.[2] Indeed, there is no finding' — and there was no suggestion— that the complainant said the “blue sweatshirt” worn by the robber was distinctive in any way that might have distinguished it from others, let alone in a way that would have established or negated a wearer’s connection to the crime. Cf. Hayes, 470 U.S. at 812, 105 S.Ct. 1643 (police sought suspect’s fingerprints to compare with latent prints found at rape scene); Class, 475 U.S. at 111, 106 S.Ct. 960 (police sought to view vehicle identification number). Nor did the witness even suggest that seeing whether appellant was wearing such a sweatshirt would enable her to make an identification when seeing appellant’s face had not, although we need not decide here whether that would have made a difference. Hence, even if the Government is correct that Hayes can be read to permit a search to facilitate a show-up under certain circumstances, the factual predicate for application of the Hayes dicta is absent here.[3]
E. The Government’s Alternative Argument, That the Unzipping Can Be Justified as an Objectively Reasonable Continuation of the Protective Frisk, Is Unsupported by the District Court’s Factual Findings
The Government’s alternative argument, that the unzipping can be justified as an objectively reasonable response to appellant’s alleged resistance during the pat down, is without support in the District Court’s factual findings. The Government never challenged the District Court’s findings as clearly erroneous. Quite the contrary, it described those findings as “consistent with the government’s evidence at the suppression hearing.” Gov’t Panel Br. at 9. And pursuant to those findings, we can ascertain no basis for concluding, as the Government urges, that “it was objectively reasonable for Officer Willis to complete the protective frisk of appellant ... by unzipping appellant’s jacket.” Gov’t Supplemental Br. at 9.
The essence of the Government’s argument is that when the complaining witness was brought to the scene, Officer Koenig broke off the pat down of appellant so that appellant could be presented to the complaining witness for identification. Id. at 7. According to the Government, prior to *1142 the show-up, appellant had resisted Officer Koenig’s attempt to pat him down. Id. at 7-8, 11. The Government thus contends that because appellant “thwarted” Officer Koenig’s pat down of his outer clothing, “it was objectively reasonable for [Officer Willis] to unzip appellant’s jacket to determine whether he had a weapon in his waist area.” Id. at 11. In other words, the Government argues that while Officer Willis’s subjective intent in unzipping appellant’s jacket during the show-up was to reveal to the complaining witness what appellant wore underneath the jacket, that unzipping was an objectively reasonable continuation of Officer Koenig’s allegedly thwarted pat down for weapons.
Tellingly, the Government does not cite to the District Court’s factual findings in support of this argument. Rather, it cites to testimony that the District Court noted, but did not credit. See id. at 7. Thus, contrary to what the Government suggests, the District Court did not find that appellant resisted or thwarted Officer Koenig’s pat down. Rather, referring in a footnote to the testimony on which the Government rests its argument, the District Court merely noted that Officer Willis had “suggested that Officer Koenig had not completed the pat-down, perhaps because of some resistance by the defendant.” Askew, 313 F.Supp.2d at 3 n. 2 (emphasis added). In other words, the District Court declined to find either that the pat down was incomplete or that appellant had in any way resisted the pat down. Indeed, the court explicitly characterizes Officer Willis’s testimony on these two points as a suggestion. Then, pointing to “[t]he government acknowledgement] that when Officer Koenig patted the defendant down, he did not find anything,” the court reiterates its own finding that “[t]he subsequent discovery of the gun at issue was not the result of this pat-down.” Id.-, see also id. at 4 (“The initial pat-down of Officer Koenig did not reveal the presence of any weapon.... ”). Thus, while we agree that the standard for determining reasonableness in the Fourth Amendment context is an objective one, see Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); United States v. (Rocky Lee) Brown, 334 F.3d 1161, 1166—67 (D.C.Cir.2004), we find that the District Court’s unchallenged factual findings provide no support for the Government’s argument that the unzipping here was objectively reasonable.[4]
Even if the Government had challenged the District Court’s factual findings as clearly erroneous, it could not succeed on its argument that the unzipping was an objectively reasonable continuation of the pat down, since that argument is based on a wholly implausible reading of the record. Consider the illogic of the Government’s proposed characterization of Officer Willis’s testimony: Officers Koenig and Willis initiate a frisk, appellant places his hands on a police cruiser, and Officer Koenig pats down appellant’s outer garments. But when Officer Koenig reaches appellant’s waist, appellant leans repeatedly against the cruiser. Appellant thus “thwarts” Officer Koenig’s efforts to frisk appellant’s waist area and consequently provides what the Government describes as an objectively reasonable basis for undertaking a protective search for a weap *1143 on. But, at this point, because the pat down is “interrupted” by the arrival of another officer with the complaining witness, the officers do not undertake a protective search of appellant’s waist area, complete the frisk, or otherwise act to ensure their safety and the safety of the complainant. Rather, they walk toward the complainant with an unhandcuffed robbery suspect who has successfully prevented them from completing a frisk of his person for weapons. See Gov’t Supplemental Br. at 7-8. This scenario makes no sense. Consequently, even if the Government had framed the issue pursuant to the correct standard of review, it could not have “definitely and firmly” convinced us that the District Court made a mistake when it chose not to credit Officer Willis’s “suggestion] that Officer Koenig had not completed the pat-down, perhaps because of some resistance by the defendant, when Officer Benton arrived with the robbery victim for a show-up.” Askew, 313 F.Supp.2d at 3. n. 2 (emphasis added).
The total implausibility of the Government’s reading of the record may explain why it abandoned any safety rationale before the District Court. In arguing its case at the close of the suppression hearing, the Government never suggested that there was anything about the pat down that provided objectively reasonable grounds for continuing the frisk or undertaking a protective search. Rather, dismissing the possibility of treating the initial unzipping as anything other than an act to facilitate the show-up, the Government confirmed for the District Court that Officer Koenig “didn’t feel anything during the traditional pat-down that would have permitted [the officers] to go into the jacket at that point, but rather they then had the show-up.” Mar. 26 Tr. at 38. The impossibility of reading the record as the Government now suggests may also explain why before the panel, as well as in its principal brief before the en banc court, the Government argued that the “sole” justification for the unzipping was to facilitate the show-up. See Gov’t Panel Br. at 18; Gov’t En Banc Br. at 22.[5]
Although we do not dispute that a protective search may be lawful when a suspect prevents the police from performing a Terry frisk, we conclude that neither the District Court’s factual findings nor *1144 the evidentiary record support the conclusion that such was the situation here.
IV. Conclusion
On the record of this case, the police officers violated appellant’s Fourth Amendment rights by unzipping his jacket without his permission and without probable cause or a warrant. The judgment of the District Court must therefore be reversed and the case remanded.

So ordered.

. In this respect, assuming, arguendo, that an unzipping to facilitate a show-up is permissible under some circumstances, a majority of the court has resolved the legal question about the permissible scope of police activity at show-ups.

. The dissent notwithstanding, this is a point that appellant expressly made to the panel on appeal. See Appellant Panel Reply Br. at 5 & n. 1 (arguing that "justification for creating a new exception to the Constitution’s prohibition against warrantless searches” is "particularly lacking in this case in which the clothing that the officer sought to reveal was a blue sweatshirt under a dark jacket, not distinctive clothing that might have distinguished appellant from others”).

. Part III.D should not be read to suggest that if the police officers in this case had a reasonable basis for believing that unzipping Askew’s jacket could merely help facilitate the witness' identification, the Hayes dicta would be satisfied. That is not the holding of the court. Rather, what we have said is that, assuming the Hayes dicta applies, the police in this case did not have a reasonable basis for believing that unzipping appellant’s jacket would establish or negate appellant's connection with the robbery for which he was stopped. Six members of the court — a majority — -join in Part III.D, equally convinced that the Government's argument resting on the Hayes dicta holds no water in this case.

. Our dissenting colleagues disagree with our reading of the District Court’s opinion. But whatever the District Court did, it certainly did not make findings to support a safety-unzipping version of events, and we have no authority to make our own findings of fact. See United States v. Burke, 888 F.2d 862, 868-69 (D.C.Cir.1989) ("The United States suggests that we might infer from the record that Burke was aware of the gun found in his tote bag. To engage in this sort of de novo fact-finding, however, would be wholly inconsistent with the function of an appellate court.”).

. In asserting that the Government "pressed” the safety rationale in the District Court, our dissenting colleagues ignore the fact that the Government abandoned the safety rationale before the District Court. The Government's safety rationale was proffered before the completion of the two-day suppression hearing at a time when, by its own admission, the Government was unsure of what its officers would say regarding the circumstances surrounding the pat down. See, e.g., Additional Case Law in Support of Government's Opposition at 2 & n. l(Mar. 19, 2004). Once Officer Willis testified to explain what transpired, see Mar. 26 Tr. at 8 ("I went to unzip [the jacket] down so that the show-up, they could see what he had on.”), the Government consistently eschewed a safety rationale argument. Thus, in its closing arguments and supplemental filing before the District Court, its brief to the three-judge appellate panel, and its en banc brief, the Government relied solely on the argument that the initial partial unzipping of appellant's jacket was reasonable under the Fourth Amendment because it was a "minimal intrusion” that "facilitated a show-up identification procedure by exposing clothing that matched the lookout description of a robbery suspect,” Gov’t Panel Br. at v; see also id. at 12, 18; Gov't En Banc Br. at vii, 13-15, 22-28; Gov't Panel Br. at 8 (summarizing the Government’s argument before the District Court); Gov't En Banc Br. at 7 (same); Second Filing of Additional Case Law in Support of Government’s Opposition at 4 (Mar. 31, 2004); Mar. 26 Tr. at 24, 26-27, 38. Not until after the en banc argument, when this court issued a supplemental briefing order asking the parties to address the possibility of justifying the initial unzipping on a safety rationale, did the Government again make the argument.