# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 9, 2009        Decided August 7, 2009

No. 08-3016

UNITED STATES OF AMERICA,
APPELLEE

v.

NELSON BROCKENBORRUGH,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 07cr00078-02)

*Richard K. Gilbert* argued the cause and filed the briefs for appellant.

*Florence Y. Pan*, Assistant U.S. Attorney, argued the cause for appellee. On the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III*, *Elizabeth Trosman*, and *Patricia A. Heffernan*, Assistant U.S. Attorneys.

Before: SENTELLE, *Chief Judge*, and ROGERS and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

2

Opinion concurring in part and dissenting in part filed by *Circuit Judge* ROGERS.

GRIFFITH, *Circuit Judge*: A jury found Nelson Brockenborrugh guilty of wire fraud and conspiracy to commit wire fraud, and the district court sentenced him to 46 months in prison. On appeal, Brockenborrugh contends that the evidence produced at trial was insufficient to support his convictions and that a number of the district court's rulings were erroneous and sufficiently prejudicial to warrant a new trial. He also argues that the district court made three errors in calculating his sentence. For the reasons set forth below, we reject these arguments and affirm Brockenborrugh's convictions and sentence.

**I.**

**A.**

Because Brockenborrugh's appeal relies in large measure on an argument regarding the sufficiency of the evidence presented at trial, we must recount that evidence in some detail. When James Roy died on October 13, 2004, he left to his heirs a multiunit residential property located at 1133 6th Street N.W., Washington, D.C. Although the condition of the property deteriorated after Roy's death, its location a block from the city's new convention center attracted the interest of a number of developers. Named as the executor of her father's estate, Katrina Robinson had to decide what to do with the rundown property. Robinson first met Brockenborrugh while visiting the property in April 2005. According to Robinson, Brockenborrugh, a retired police officer who worked as a Court Security Officer (CSO) at the D.C. Superior Court, and his realtor, Denise McLeod, were at the site and asked her about buying the property. During this conversation, McLeod

told Robinson she was an employee of the D.C. government, introduced Brockenborrugh as a U.S. Marshal, and said, "[W]e have been watching your property, because we have been getting several complaints . . . about the things . . . going on there." Trial Tr. 189–90 (Oct. 23, 2007). Brockenborrugh told Robinson that he was "working with" the U.S. Marshals, Trial Tr. 44 (Oct. 24, 2007), showed her a gold-plated badge, and stated that he was a retired police officer. Robinson told them that once she was officially appointed executor, she would consult with her family and then decide whether to sell. The three exchanged phone numbers, and Robinson told Brockenborrugh and McLeod to contact her lawyer, David Scull, if they remained interested in buying the property. On June 21, 2005, McLeod called Scull. She told him that "U.S. Marshal Brockenborrugh wanted to buy the property" and could assist in solving the problem created by squatters who had moved into its abandoned units. Trial Tr. 131 (Oct. 18, 2007). McLeod also advised Scull that she was "monitoring every aspect" of the property. *Id.* at 132.

On September 8, 2005, McLeod filed with the District of Columbia Recorder of Deeds a fraudulent deed that purported to convey the property from James Roy to her for $10,000. Because the deed reflected a nominal sale price, the District required an additional payment of $7610, which included a transfer tax and recording fee based on the assessed value of the property. Two other people helped McLeod file the deed. Cynthia Russell "witnessed" James Roy's signature (though, of course, Roy did not posthumously sign the deed). LaShawn Lewis notarized the deed in return for $250. (Both pleaded guilty to charges related to these actions.) A week later, Brockenborrugh wrote McLeod a check for $8804, approximately one half of the total purchase price, and noted on the memo line, "For my half of 1133 6th St NW." App. at 49. At trial, Brockenborrugh testified he wrote the check

because he "just wanted to make sure that [he] was included in to what [he] thought was a legal transaction." Trial Tr. 88–89 (Oct. 25, 2007). He had asked McLeod, "[H]ow much do I owe you?," *id.* at 155, and she responded, "[R]ight now I don't know what the total price is going to be, but for now I have had to pay the water and tax bill . . . [s]o this is what the price is," *id.* at 155–56. McLeod subsequently agreed to sell the property to developer Kenneth Silbert for $300,000. When Silbert's lawyer conducted a title search, he uncovered the fraudulent deed. Silbert instructed him not to tell Robinson.

On October 6, 2005, Metropolitan Police Department Officer Israel James was called to the property, where he found Brockenborrugh and McLeod. Brockenborrugh was wearing his CSO uniform and may also have been wearing his CSO security badge. According to Officer James, the two claimed they had "authority" over the property and complained that squatters needed to be removed. Trial Tr. 33–34 (Oct. 22, 2007). Brockenborrugh does not deny he was at the property but claims that only McLeod talked to the police. Two investigators from the fire department also responded at the scene. Because the squatters had been poaching electricity and creating a fire hazard, they declared the property uninhabitable and ordered the squatters to leave. Later that day, a bystander called Robinson to report that McLeod was hanging around the property saying she was the new owner. The caller then passed the phone to McLeod, who told Robinson she "was getting [the squatters] out" and would "contact her later." Trial Tr. 202 (Oct. 23, 2007). Wondering why McLeod was at the property, Robinson called her lawyer, Scull. Scull ran his own title search, discovered the fraudulent deed assigning the property to McLeod, and, with the encouragement of Robinson, called the FBI.

On October 19, 2005, Robinson, wearing an FBI wire, met with Brockenborrugh, McLeod, Silbert, and Nathan Carter, who is alleged to be the person that would finance any purchase of the property. During their conversation with Robinson, members of the group made representations that implied the property was worthless, and Brockenborrugh claimed responsibility for the removal of the squatters. As a retired police officer, he said that he had asked a few current officers whom he knew to keep an eye on the property. This increased protection, he boasted, had prevented the squatters from reentering and ended the neighbors' complaints about the property's condition. Brockenborrugh added that one of the squatters had seen him at the courthouse and said, "[O]h you're a real marshal." App. at 105. Robinson interjected, "Oh he didn't think you were?" *Id.* at 106. "He didn't believe it," confirmed Brockenborrugh. *Id.* Brockenborrugh testified that he did not correct the occupant because the comment "didn't really phase [sic] [him]." Trial Tr. 174 (Oct. 25, 2007).

Brockenborrugh, McLeod, and Carter also told Robinson that she faced a number of risks by retaining the property. For example, they warned her that the squatters might burn down the building. Brockenborrugh said the situation was "really, really serious" and that each passing day was like "spinning the roulette wheel." App. at 117. McLeod told Robinson that the squatters could sue her because the building contained asbestos that was making them ill. She also warned Robinson that the city could file a "wrongful housing" suit and assess a fine on the property but had not yet done so because of Brockenborrugh's influence. *Id.* at 118–19.

Robinson said that her family wanted $825,000 for the property. McLeod rejected that price out of hand. She argued that the building itself was worth nothing and that the land was worth only $99,000 to $130,000. The group offered

Robinson $130,000 and presented her with a contract. Robinson asked for more information about all the buyers except for Brockenborrugh. She stated that she "[knew] about Mr. US Marshall [sic]." *Id.* at 137. Brockenborrugh urged Robinson to act quickly, adding that the police would check on the property so long as he was "still in the mix." *Id.* at 143. If he did not "do his part," they would stop. *Id.* at 144.

Two days later, McLeod faxed to Robinson a document that purported to be an official District of Columbia "Property Detail," which contained fictitious assessments of the property. The document was fraudulent in several respects, and the value of the property's improvements was listed as "$0.00 (inhabitable) [sic]," *id.* at 50–51. McLeod later faxed a revised contract along with a letter assuring the Roy heirs that the only issues revealed by a title search were outstanding property taxes and water bills. Obviously, the letter did not mention the fraudulent deed.

The FBI convened a second meeting with the group, during which an undercover agent posed as "James Roy, Jr." Also present were Robinson, another undercover agent, McLeod, Carter, and Silbert. McLeod explained that Brockenborrugh could not make the meeting because, as "a U.S. Marshall [sic]," he was "assigned to a judge" that day. R. Material Tab 3, 3. The agent posing as James Roy, Jr., stated that he wanted $200,000 for the property. The parties eventually agreed to a purchase price of $165,000. At that point, Brockenborrugh joined the meeting via speakerphone. McLeod told him that "James Roy" wanted $165,000 and asked, "[C]an we go forward with that?" *Id.* at 32. Brockenborrugh replied, "I'll go with that." *Id.* at 33.

**B.**

By an indictment filed March 22, 2007, the grand jury charged Brockenborrugh and McLeod with five crimes: (1) wire fraud in violation of 18 U.S.C. § 1343; (2) conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349; (3) first-degree fraud in violation of D.C. CODE §§ 22-3221(a), -1805; (4) forgery in violation of D.C. CODE §§ 22-3241, -1805; and (5) uttering a forged instrument in violation of D.C. CODE §§ 22-3241, -1805. McLeod pleaded guilty to each count shortly before trial and did not take the stand. The jury found Brockenborrugh guilty of wire fraud and conspiracy to commit wire fraud, but acquitted him of the other charges.

At trial, the district court made three rulings relevant to this appeal. The first concerned whether Robinson's attorney, Scull, could testify about statements McLeod made to him during their June 21, 2005, telephone conversation. The district court admitted the testimony under Federal Rule of Evidence 801(d), which provides an exemption to the rule against hearsay for statements of a co-conspirator made in furtherance of the conspiracy. Second, the district court ruled that the government could question Brockenborrugh about his sexual relationship with McLeod, finding that the prejudicial value of the testimony would not outweigh its probative worth. And third, the district court refused Brockenborrugh's request for a jury instruction on multiple conspiracies, finding it was not supported by the evidence.

At sentencing, the parties agreed that section 2B1.1 of the Federal Sentencing Guidelines, which governs offenses involving fraud, applied and that Brockenborrugh's base offense level was 7. *See* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 (2007) [hereinafter U.S.S.G.]. The parties disagreed, however, over how much the court should increase

Brockenborrugh's sentence under that section, which ties a defendant's total offense level to the amount of loss for which he is responsible, *see id.* § 2B1.1(b). The district court concluded that Brockenborrugh's conduct involved an intended loss between $200,000 and $400,000, and thus warranted a twelve-level increase. Over Brockenborrugh's objection, the district court also applied two enhancements: (1) a two-level enhancement for abuse of trust because Brockenborrugh falsely represented that he was a U.S. Marshal to significantly facilitate his offense; and (2) another two-level enhancement for obstruction of justice because Brockenborrugh lied on the stand. The resulting offense level was 23, which translated into a sentencing range of 46 to 57 months under the Sentencing Guidelines because Brockenborrugh had no prior criminal history. The district court sentenced Brockenborrugh to 46 months' imprisonment followed by two years of supervised release.

## II.

On appeal, Brockenborrugh renews his challenges to the district court's trial and sentencing rulings and also argues that there was insufficient evidence for a jury to conclude he engaged in any fraudulent conduct. We have jurisdiction to consider these arguments under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

We begin with the argument that there was insufficient evidence to support Brockenborrugh's convictions. Our review of such challenges is narrow. We must view the evidence in the light most favorable to the government and "accept the jury's guilty verdict if we conclude that 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Branham*, 515 F.3d 1268, 1273 (D.C. Cir. 2008) (quoting

*United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002)). Brockenborrugh does not dispute that the evidence established two attempts to fraudulently obtain the property located at 1133 6th Street N.W.: the filing of the forged deed and the effort to cause the Roy heirs to sell the property for an unreasonably low price. Nor does he dispute there was a conspiracy to get the property unlawfully. Rather, Brockenborrugh argues that the evidence did not prove that he knowingly sought to defraud the Roy heirs or participated in a conspiracy to do the same. To commit wire fraud, he must have knowingly and willingly entered into a scheme to defraud. To be convicted of conspiracy, he must have entered into an agreement with another with the intent to commit wire fraud. *See United States v. Alston-Graves*, 435 F.3d 331, 337 (D.C. Cir. 2006). In Brockenborrugh's view, the evidence showed only that he thought "the attempted purchase of 1133 Sixth Street from the heirs was progressing in the same manner as a lawful real estate transaction." Br. of Appellant at 27.

We disagree. There is ample evidence in the record from which the jury could reasonably infer that Brockenborrugh was a knowing participant in the unlawful scheme to obtain the property. To begin with, the jury could conclude from Brockenborrugh's connection to the forged deed that he knowingly entered a scheme with McLeod to defraud the Roy heirs. This inference finds support in the check Brockenborrugh wrote McLeod after learning she had "purchased" the property. *See* App. at 49. Although the defense argued that Brockenborrugh did not think this was his final payment, the jury could have reasonably found that Brockenborrugh thought that it was and that he knew the property was being obtained by fraud.

Brockenborrugh argues that the jury's verdict on the D.C. counts of fraud, forgery, and uttering a forged instrument shows that he was "*acquitted* of all counts directly relating to the forged deed." Br. of Appellant at 9. Not so. As we just explained, the federal counts also implicate the forged deed. The jury's verdict on the D.C. counts in no way undermines this conclusion. Under D.C. law, a person commits the offense of forgery or uttering "if that person makes . . . or utters a forged written instrument with the intent to defraud . . . another." D.C. CODE § 22-3241(b). Anyone who advises, incites, aids, or abets forgery or uttering is liable as a principal. *Id.* § 22-1805. Brockenborrugh's conduct does not fall within either provision. He did not make or utter the forged deed, and there is no evidence that he advised or aided its creation. Likewise, a person commits first-degree fraud under D.C. law if he actually defrauds another thereby causing that person to lose his property. *Id.* § 22-3221(a). The scheme to get the property was ultimately unsuccessful. That there was insufficient evidence to convict Brockenborrugh of these crimes under D.C. law does not absolve him of his involvement with the forged deed under the federal counts.

Brockenborrugh's knowing participation in the fraud can also reasonably be inferred from his role in the second attempt to secure the property from the Roy heirs. The evidence shows that Brockenborrugh falsely represented to Robinson that he was a U.S. Marshal, and Robinson testified that Brockenborrugh led her to believe that he had influence over police officers who were protecting the property on his behalf. Brockenborrugh also suggested to Robinson that if the property was not sold to his group, police protection would cease, the property would be ruined, and the estate would be liable. These actions were vital to the plot to convince Robinson to sell the property at a deflated price, and a jury could reasonably infer from them that Brockenborrugh

knowingly entered into a scheme with his co-conspirators to defraud the Roy heirs.

### III.

Brockenborrugh challenges three trial rulings: (1) the decision to allow attorney Scull to testify about statements McLeod made to him in June 2005; (2) the decision to allow the government to cross-examine him about his sexual relationship with McLeod; and (3) the refusal to give a jury instruction regarding the existence of multiple conspiracies. We consider each in turn.

### A.

Over the objection of defense counsel, the district court allowed Scull to testify about statements McLeod made during their June 2005 phone conversation. According to Scull, McLeod said that "U.S. Marshal Brockenborrugh" wanted to buy the property and could assist with the squatter problem. Trial Tr. 131 (Oct. 18, 2007). The district court provisionally admitted this testimony subject to proof of a conspiracy under Federal Rule of Evidence 801(d)(2)(E), which provides that a statement is not hearsay if it is offered against a party and is made "by a coconspirator of [that] party during the course and in furtherance of the conspiracy."

The question on appeal is whether the district court correctly found that Brockenborrugh and McLeod were engaged in a conspiracy at the time McLeod made the statements to Scull. At the close of the government's case, the prosecutor argued that a conspiracy, as that term is used in Rule 801(d)(2)(E), could be inferred as early as April 2005 or at the latest by September 2005, when Brockenborrugh wrote the check to McLeod. The district court found that there was

"overwhelming evidence of a business relationship between Ms. McLeod and Mr. Brockenborrugh" in April 2005, Trial Tr. 48 (Oct. 25, 2007), and "overwhelming evidence that there was a conspiracy to commit wire fraud" in September 2005, *id.* at 49. Brockenborrugh argues that although the district court may have ruled on the existence of a conspiracy in April and September, it failed to find a conspiracy in June.

We typically review the admission of evidence under Rule 801(d)(2)(E) for clear error. *See United States v. Gatling*, 96 F.3d 1511, 1521 (D.C. Cir. 1996). The government, however, argues that the plain error standard of review applies because defense counsel did not renew the objection or move to strike Scull's testimony after the district court ruled on the scope of the conspiracy.[1] Because we find that the district court committed no error—clear, plain, or otherwise—in admitting the testimony we need not decide which standard best fits these facts.

We have previously explained that when admitting testimony under Rule 801(d)(2)(E), "the district court must find by a preponderance of the evidence that a conspiracy existed and that the defendant and declarant were members of that conspiracy." *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006). Admission, however, is not contingent upon the finding of an unlawful combination. Rather we have held that, despite its use of the word "conspiracy," Rule 801(d)(2)(E) allows for admission of statements by individuals acting in furtherance of a lawful joint enterprise.

---

[1] When a party forfeits a challenge by failing to raise it below, the general rule is that plain error review applies. *See* FED. R. CRIM. P. 52(b). The plain error standard of review imposes a more substantial burden on criminal defendants than does clear error review, and is intended to ensure that forfeited-but-obvious errors do not effect a miscarriage of justice.

*See Gewin*, 471 F.3d at 201–02; *United States v. Weisz*, 718 F.2d 413, 433 (D.C. Cir. 1983) (stating that the rule, which derives from agency and partnership law, "embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are . . . admissible against the others, if made in furtherance of the common goal"). Citing *Gewin*, the district court found "overwhelming evidence" that Brockenborrugh and McLeod were engaged in a "business relationship" as early as April 2005. Trial Tr. 48 (Oct. 25, 2007). Our review of the record supports this conclusion and reveals ample evidence that this relationship continued such that in June 2005, the pair was engaged in a lawful joint enterprise to acquire the property. For example, Brockenborrugh testified that McLeod, at the time of her conversation with Scull, was acting as his real estate agent for his attempted purchase of the property. *Id.* at 78–81. McLeod's statements to Scull that "U.S. Marshal Brockenborrugh" was interested in buying the property were made in furtherance of this enterprise and properly admitted.

## B.

Brockenborrugh also argues that the district court erred in allowing the government to cross-examine him about his sexual relationship with McLeod. We review this ruling for abuse of discretion. *See United States v. Fonseca*, 435 F.3d 369, 373 (D.C. Cir. 2006).

After hearing arguments from both sides, the district court determined that cross-examination was needed to show the "closeness" of Brockenborrugh's relationship with McLeod and "for . . . impeachment purposes to cast doubt [on Brockenborrugh's] credibility." Trial Tr. 57 (Oct. 25, 2007). The court concluded that any prejudice that might result from

14

questions asked about the sexual relationship would be outweighed by the probative value of the testimony given. When Brockenborrugh took the witness stand, defense counsel asked him to tell the court and the jury "basically" his relationship with McLeod. *Id.* at 68. Brockenborrugh answered that McLeod "did taxes" for half of the CSOs in the courthouse, "did real estate," and was his property manager. *Id.* at 68–69. He did not mention the sexual component of the relationship. On cross-examination, the prosecutor first asked Brockenborrugh if he had a chance to finish his answer about the relationship, and Brockenborrugh responded that he had. The prosecutor pressed further and questioned him about his sexual relationship with McLeod. Only then did Brockenborrugh acknowledge its existence between 2002 and late 2004 or early 2005. He also admitted to concealing the relationship when first interviewed by the FBI. *See id.* at 133–39. At the close of trial, the court instructed the jury not to consider the sexual relationship as proof of Brockenborrugh's bad character but only as evidence of the true nature of his relationship with McLeod and of Brockenborrugh's credibility based on his failure to describe the full extent of that relationship during his direct testimony.

The district court acted well within its discretion in permitting the cross-examination. Cross-examination of a criminal defendant is permissible on the subject matter of the defendant's direct examination and matters affecting credibility. *See* FED. R. EVID. 611(b); *see also United States v. Raper*, 676 F.2d 841, 846 (D.C. Cir. 1982). Brockenborrugh's testimony on direct examination suggested that he and McLeod had nothing more than a business relationship. The government was therefore entitled to elicit further testimony to show the true nature of the relationship. Brockenborrugh argues that cross-examination on this subject should have been prohibited under Federal Rule of Evidence 403, which

allows for the exclusion of evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The district court, however, "'is in the best position to perform [the] subjective balancing' required under Rule 403." *United States v. Johnson*, 519 F.3d 478, 483 (D.C. Cir. 2008) (quoting *United States v. Cassell*, 292 F.3d 788, 795–96 (D.C. Cir. 2002)) (alteration in original). Upon review, we see no abuse of discretion in the balance struck by the district court. The probative value of the evidence was substantial as it spoke to the central issue in the case: whether Brockenborrugh was a knowing participant in the fraudulent scheme or an innocent real estate investor caught up in McLeod's thievery. The only prejudicial effect identified by Brockenborrugh is the possible inference "that a person who 'cheats' on his wife cannot be trusted," Br. of Appellant at 33. Any such effect was mitigated by the district court's instruction to the jury to disregard the relationship as evidence of bad character. *Cf. Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it . . . .").

## C.

Brockenborrugh's final contention regarding his trial is that the district court erred in refusing to instruct the jury to consider whether the evidence supported the existence of multiple conspiracies. The district court determined that such an instruction was not warranted. We review this decision de novo. *United States v. Dickerson*, 163 F.3d 639, 641 n.3 (D.C. Cir. 1999). If the record supports the existence of multiple conspiracies, the jury must be instructed to consider them. *United States v. Hemphill*, 514 F.3d 1350, 1363 (D.C. Cir.

2008). Brockenborrugh argues that a jury could have found several conspiracies to obtain the property and that he was involved in only some of them. This instruction, according to Brockenborrugh, would have allowed the jury to distinguish his legitimate activities from the fraudulent ones of McLeod and others. For example, Brockenborrugh argues that the creation of the forged deed and its concealment from Robinson were two separate conspiracies, and that he was not involved in either. But a single conspiracy can "pursue multiple schemes with different *modi operandi* without dividing into multiple conspiracies, as long as there is a single objective." *Id.* at 1364. Whether a course of conduct should be classified as a single conspiracy or divided into multiple conspiracies depends on whether the participants shared a common goal, were dependent upon one another, and were involved together in carrying out at least some parts of the plan. *See United States v. Mathis*, 216 F.3d 18, 23–24 (D.C. Cir. 2000); *cf. Hemphill*, 514 F.3d at 1364 ("The mere fact that the conspirators found different ways to [carry out their crime] does not break the conspiracy into parts.").

We think the record is best interpreted as showing a single conspiracy to acquire the property. Although the conspirators may have tried to achieve their goal in different ways, their actions demonstrate pursuit of a sole objective: the fraudulent acquisition of the Roy property. McLeod filed a forged deed in an attempt to secure title, and Brockenborrugh reimbursed half of the claimed cost to buy the property. When that failed, McLeod, Brockenborrugh, and others sought to fraudulently obtain the property from Robinson and the other Roy heirs. The participants all worked toward a common goal, and although Brockenborrugh may not have participated in every step of the conspiracy, it is clear that he was significantly involved from start to finish. Accordingly, we hold that the evidence establishes a single conspiracy. The

district court did not err in refusing to give the jury Brockenborrugh's requested instruction.

## IV.

Brockenborrugh also appeals from his sentence, arguing the district court made three clearly erroneous factual findings in calculating his sentencing range. When applying the clear error standard of review, we are mindful that the trial judge has a unique opportunity "to evaluate the credibility of witnesses and to weigh the evidence." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982); *see also* HARRY T. EDWARDS & LINDA A. ELLIOT, FEDERAL COURTS STANDARDS OF REVIEW: APPELLATE COURT REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 21 (2007) (explaining clearly erroneous standard). Accordingly, we affirm unless we are "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

We begin with Brockenborrugh's argument that the district court did not properly calculate the monetary loss associated with his offense. Under section 2B1.1 of the Guidelines, a defendant's offense level depends in part on the loss—actual or intended—for which he is responsible. *See* U.S.S.G. § 2B1.1(b)(1) & cmt. n.3(A). Of course, Brockenborrugh caused no actual loss because the scheme was ultimately unsuccessful. But the district court found that the conspirators planned to sell the property to Silbert for $300,000. Under section 2B1.1, that amount of intended loss required a twelve-level increase to Brockenborrugh's base offense level. Brockenborrugh does not object to the $300,000 figure as a "starting point," *see* Reply Br. of Appellant at 7, but argues it should have been discounted by the $165,000 he and his co-conspirators agreed to pay the Roy heirs in their

second attempt to obtain the property. According to Brockenborrugh, the amount of loss is at most $135,000, which calls for a ten- rather than a twelve-level increase.

The district court's loss calculation is a factual finding that we review for clear error. *United States v. Leonzo*, 50 F.3d 1086, 1088 (D.C. Cir. 1995).[2] Brockenborrugh's argument is flawed because it overlooks the effort to obtain the property using the fraudulent deed. Had Brockenborrugh and McLeod succeeded, the conspirators would have sold the property for $300,000 without any involvement by its rightful owners. It was only after this first attempt failed that Brockenborrugh and McLeod agreed to pay any money to the Roy heirs. Brockenborrugh fails to account for this first attempt because he argues there is no evidence "linking him to McLeod's fraudulent deed scheme," Reply Br. of Appellant at 8. But as we have explained, this is simply not true. Accordingly, there is no reason for deducting any amount from the $300,000 of intended loss.

---

[2] The government argues, and Brockenborrugh seems to agree, that Brockenborrugh's challenges to the district court's factual findings are subject to plain error review under *United States v. Olano*, 507 U.S. 725, 732 (1993), because they were not raised before the district court. *See* Br. of Appellee at 51. Our case law on this issue is not settled, and two members of this court have recently expressed the view in a concurring statement that we must apply a clear error standard of review to factual findings made at the time of sentencing regardless of whether the defendant objected to those findings below. *See In re Sealed Case*, 552 F.3d 841, 848–52 (D.C. Cir. 2009) (Edwards, J., concurring, joined by Silberman, J.). Because we find no clear error—much less plain error—in the district court's factual findings, we affirm without taking up this question.

Brockenborrugh next argues that the district court erred by enhancing his sentence for abuse of a position of trust. Section 3B1.3 of the Guidelines provides that if a defendant holds himself out to his victim as occupying a position of public trust in a way that significantly facilitates the commission of the offense, his sentence may be increased by two levels. U.S.S.G. § 3B1.3 & cmt. n.3. The district court determined that there was "absolutely no question . . . that [Brockenborrugh] acted so as to create the impression in the minds of a number of individuals that he was a United States Marshal." Trial Tr. 23 (Feb. 14, 2008). Brockenborrugh disputes this finding, arguing that he never held himself out as a U.S. Marshal and that, even if he did, he did not use his representations to facilitate an offense.

Because this challenge calls into question findings of fact, we again review for clear error. *See* 18 U.S.C. § 3742(e) (2006); *see also United States v. Henry*, 557 F.3d 642, 644–45 (D.C. Cir. 2009). There is evidence that Brockenborrugh held himself out as a U.S. Marshal. For example, Brockenborrugh told Robinson that one of the property's squatters, seeing him at the courthouse, said, "[O]h you're a real marshal." App. at 105. Brockenborrugh did not correct him, but instead adopted the characterization and stated that the squatter had not previously believed that he held such a position. *See id.* at 106. During that same conversation, when the conspirators presented Robinson with a contract to buy the property, she requested additional information about the buyers but told Brockenborrugh that she already knew about "Mr. US Marshall [sic]." *Id.* at 136–37. Again, Brockenborrugh made no effort to correct her mistaken impression.

There is also evidence that Brockenborrugh used these misrepresentations to facilitate the offense. The scheme required convincing Robinson that the property was worth

little or nothing and that her only realistic option was to sell it to the conspirators for a price she would not realize was well below its true value. Brockenborrugh used his fictitious status as a U.S. Marshal toward this end. For example, after telling Robinson that the squatter recognized him as a "real marshal," Brockenborrugh claimed that the only reason the squatters had not reentered the property was his continuing involvement in its purchase. And, as noted, Robinson did not press for additional information about Brockenborrugh because she believed him to be a U.S. Marshal. Thus the district court did not clearly err in concluding that Brockenborrugh presented himself as a U.S. Marshal and used that representation to facilitate his offense.

Finally, Brockenborrugh argues that the district court erred in increasing his offense level for obstruction of justice. Section 3C1.1 of the Sentencing Guidelines provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct[,] increase the offense level by 2 levels.

The commentary to this guideline provides a nonexhaustive list of conduct that may constitute obstruction of justice, including perjury, destroying or concealing material evidence, and providing a materially false statement to law enforcement to significantly obstruct an official investigation. *See id.* § 3C1.1, cmt. n.4. The commentary makes clear, moreover, that "the conduct to which th[e] adjustment applies is not subject to precise definition." *Id.* § 3C1.1, cmt. n.3.

The district court applied this adjustment because Brockenborrugh lied on the stand, finding that "[h]e very obviously denied his extremely close, not to say intimate relationship with, Ms. McLeod," "falsely denied that he evicted the tenants," and "denied that he threatened Ms. Robinson . . . that he could influence the police to withdraw their extra attention and protection for the property." Trial Tr. 24–25 (Feb. 14, 2008). Brockenborrugh does not dispute that lying on the stand is grounds for applying this adjustment. Instead he claims that his testimony was truthful, which is another challenge to the district court's factual findings that we review for clear error, 18 U.S.C. § 3742(e).

Brockenborrugh's testimony about his ability to influence the police to protect the property provides ample support for the district court's decision that he lied. During the first group meeting, Brockenborrugh threatened to have the police stop paying extra attention to the property, which meant, in effect, that the police would leave the property without protection from squatters. He told Robinson his group's involvement in the sale was "the only reason why the police [we]re doing anything" to keep the squatters out of the building. App. at 143 (wire transcript). Although acknowledging that the police had a general duty to protect all property, Brockenborrugh cynically added, "[Y]ou know how police are," implying that without his participation the police would do nothing at all to protect this property. *Id.*; *see also id.* at 143–44. At trial, Brockenborrugh admitted he threatened that extra police attention would cease were Robinson to stop dealing with his group. He denied, however, threatening that police protection would cease altogether. He stated that he merely meant the police "wouldn't be going by there on [his] behalf. [It] is their job to go by there and check on that property, or any property." Trial Tr. 187 (Oct. 25, 2007); *see also id.* at 187–88 ("Q: [Y]ou meant to suggest to Ms. Robinson that if you

pulled out of the deal, . . . the police . . . will go away, right? A: I didn't mean that they would go away just because I was out of the deal.").

The district court concluded that Brockenborrugh lied at trial about what he said to Robinson regarding the level of protection the police would give the property. In a spare explanation, the district court said only that Brockenborrugh lied about his threat to withdraw the police's "extra attention and protection for the property." Trial Tr. 25 (Feb. 14, 2008). We read this explanation as referring not only to Brockenborrugh's threat to remove extra attention but also to his threat to remove all protection from the property. Because Brockenborrugh's testimony about this latter threat was untruthful, we conclude that the district court did not clearly err in deciding that Brockenborrugh's trial testimony contradicted what he had told Robinson and warranted an enhancement for obstruction of justice.

Our dissenting colleague argues that the district court did not base its finding of obstruction of justice on Brockenborrugh's lie at trial about his threat to withdraw all police protection from the property. Rather, according to her reading, the district court mistakenly relied on a nonexistent contradiction in what Brockenborrugh said about withdrawal of extra police attention for the property. Were we to read the district court's explanation as referencing only the withdrawal of extra police attention, we would agree with the dissent. Brockenborrugh admitted at trial that he threatened to withdraw the extra police attention. But given the evidence presented at trial and the "crystal clear" discrepancy between Brockenborrugh's testimony and his recorded statements, Trial Tr. 25 (Feb. 14, 2008), it is apparent that the district court based its conclusion on a finding that Brockenborrugh lied at trial when he denied having made a threat to withdraw

even minimal police protection for Robinson's property. This reading of the district court's explanation is bolstered by the fact that the government argued in its sentencing memorandum for an enhancement not because Brockenborrugh lied about the extra police attention, but because he lied about "threaten[ing] Ms. Robinson that he could cause the withdrawal of police attention to her property" altogether. Government's Mem. in Aid of Sentencing at 7. The district court enhanced Brockenborrugh's sentence at the government's request, which strongly suggests that it relied on the lie the government identified about the threatened withdrawal of all police protection.

We reject the dissent's suggestion that we reach this conclusion through impermissible appellate factfinding. *See* Dissenting Op. at 7 ("[F]actfinding is the basic responsibility of district courts, rather than appellate courts, and . . . the Court of Appeals should not . . . resolve[] in the first instance [a] factual dispute which had not been considered by the District Court." (quoting *In re Sealed Case*, 552 F.3d 841, 845 (D.C. Cir. 2009) (alterations in original))). To the contrary, we have explained why the district court's factfinding and conclusion are not clearly erroneous. We have found no facts and have in no way usurped the district court's factfinding function. We have, instead, respected it, and merely described the relevant context to show the district court's decision is best understood as increasing Brockenborrugh's sentence because he lied at trial about his threat to withdraw police protection from the property. The dissent, reading the district court's explanation in a parsed manner that overlooks its meaning in context, simply disagrees that this conclusion correctly conveys what the district court had in mind.

The district court's decision is independently supported by Brockenborrugh's lie in his testimony about his relationship with McLeod. Viewing the testimony on this subject in the light most favorable to Brockenborrugh, the district court could have concluded that Brockenborrugh testified truthfully about the relationship; he did not deny its existence and the first time he was asked about the sexual nature of the relationship on cross-examination, he answered honestly. But it is also reasonable to conclude that he lied about the relationship. Brockenborrugh was on notice that his relationship with McLeod was relevant because he put the relationship at issue. His central defense, after all, was that he was an innocent investor deceived by McLeod, his realtor, to join unwittingly in an unlawful business transaction. And before Brockenborrugh took the stand, the district court heard argument between counsel in Brockenborrugh's presence on whether he could be cross-examined about his sexual relationship with McLeod. It is fair to infer that Brockenborrugh was intentionally concealing the true nature of his relationship when he testified that his prior description, which made no mention of the romance, was complete.[3] "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

---

[3] The dissent makes much of the fact that Brockenborrugh was merely asked to describe "basically" his relationship with McLeod. *See* Trial Tr. 68–69 (Oct. 25, 2007); *see also* Dissenting Op. at 11–15. But Brockenborrugh and McLeod's two-and-a-half-year affair was a "basic" element of their relationship, and it seems reasonable that he would have mentioned it as such despite his view that he was not McLeod's "boyfriend or anything," Trial Tr. 134 (Oct. 25, 2007).

Our dissenting colleague states that a more searching form of clear error review applies because this case does not require us to "review[] factual findings based on assessments of the credibility of a witness." Dissenting Op. at 2. Yet that is exactly what we are called upon to do. *Cf. Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499–501 (1984) ("The same 'clearly erroneous' standard applies to findings based on documentary evidence as to those based entirely on oral testimony, but the presumption has lesser force in the former situation than in the latter." (citations omitted)). Upon viewing Brockenborrugh's demeanor on the witness stand and hearing all of the evidence presented at trial, the district court determined that Brockenborrugh lied about his sexual relationship with McLeod. On clear error review, appellate judges should not comb through the record seeking to identify the best factual inferences to draw from the transcript of a witness's testimony. "The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." *Bessemer City*, 470 U.S. at 574. We must defer to the considered judgment of the trial judge. Doing so, we hold that the district court did not clearly err in finding Brockenborrugh lied on the stand.

## V.

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

ROGERS, *Circuit Judge*, concurring in part and dissenting in part: A sentencing enhancement for perjury under section 3C1.1 of the United States Sentencing Guidelines ("U.S.S.G.") "can be imposed only if the district court finds that the defendant gave 'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). The district court concluded that Brockenborrugh's sentence should be increased for obstruction of justice upon finding he had committed perjury at trial by denying: (1) he had evicted the squatters occupying the real property that was the object of the conspiracy, (2) he had threatened the executor that he would withdraw the extra attention and protection that his connections with local police had obtained for the property, and (3) he had an intimate relationship with his co-defendant, Denise McLeod. These were the only findings made by the district court in determining an obstruction of justice enhancement was appropriate.

This court does not address the first finding and there is no support for it in the record. This court's efforts to find support for the other two findings are valiant, but those findings are directly contradicted by trial testimony that shows Brockenborrugh admitted making the threat and having the intimate relationship. The court acknowledges that the district court clearly erred by finding that Brockenborrugh threatened to withdraw the extra police attention but discovers an additional, non-erroneous finding that was neither argued by the parties nor articulated by the district court. As regards the relationship, the court finds that Brockenborrugh's testimony could be construed as insufficiently forthright. Op. at 24-25. Perhaps so. But that is not what the district court found, nor what the Sentencing Guidelines require. *See* U.S.S.G. § 3C1.1 & cmt. nn. 2, 4(a). Because *de novo* factfinding is incompatible with the role of an

appellate court, *see, e.g.*, *United States v. Burke*, 888 F.2d 862, 869 (D.C. Cir. 1989), I would remand the case for resentencing.

**I.**

In *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 597 (2007), the Supreme Court reaffirmed that review of a sentencing court's factual findings is for clear error. *See also United States v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008); *United States v. Edwards*, 496 F.3d. 677, 681 (D.C. Cir. 2007). Accordingly, this court's role is limited to determining whether "the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985). Under clear-error review, the court may not disturb the district court's factual findings unless it is "left with the definite and firm conviction that a mistake has been committed." *Id.* at 573. But this deference to the sentencing court's choice between "two permissible views of the evidence," *id.* at 574, does not mean that this court may uphold an erroneous factual finding simply because the record contains some "evidence to support it," *id.* at 573. Nor, as a practical matter, does it require this court to approach all factual findings in the same way. *See Easley v. Cromartie*, 532 U.S. 234, 243 (2001); *Bessemer City*, 470 U.S. at 575; *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499-501(1984). In the instant case, this court is not reviewing factual findings based on assessments of the credibility of a witness or the culpability of a defendant's mental state but the district court's straightforward findings that while on the witness stand Brockenborrugh falsely denied three things. *See* Op. at 21. The court is to be cognizant, in determining whether the sentence should be remanded in light of clearly erroneous factual findings, of the lesser costs to the systemic interests in finality where resentencing, as opposed to retrial, is the

appropriate remedy. *See United States v. Saro*, 24 F.3d 283, 287-88 (D.C. Cir. 1994).

The background to the district court's imposition of the obstruction of justice enhancement is as follows. Without any citations to the record, the government's sentencing memorandum asserted that Brockenborrugh had committed perjury at trial by falsely denying that he: "evicted the tenants," "displayed a U.S. Marshals badge," "asserted the authority of a federal marshal," "represented himself to the heirs as a federal marshal," "threatened [the executor] Ms. Robinson that he could cause the withdrawal of police attention to her property," and "had an ongoing relationship with his co-defendant." Gov't's Sent. Mem. 7. The government therefore asked the district court to increase the sentence based on his obstruction of justice. *Id.* citing U.S.S.G. § 3C1.1, & cmt. n. 2. The presentence report did not make a recommendation regarding obstruction of justice under § 3C1.1. In written objections to the presentence report, defense counsel stated: "There is no evidence of obstructing justice in this case and the allegations of the government are without merit. The transcript of the proceedings will sustain the defendant[']s position." Opp'n Mem. 2. Counsel repeated his objection at the sentencing hearing.[1]

The district court concluded that a two-level upward adjustment in the offense level for obstruction of justice was warranted. In the district court's view, the trial testimony had been "crystal clear" as to Brockenborrugh's obstruction of

---

[1] In urging that Brockenborrugh has failed to show "error, let alone plain error," Appellee's Br. 58, the government overlooks defense counsel's timely, on-point objection. *See United States v. Rashad*, 396 F.3d 398, 401 (D.C. Cir. 2005) (citing FED. R. CRIM. P. 51(a)); *United States v. Edmond*, 52 F.3d 1080, 1103-04 (D.C. Cir. 1995).)

justice. Trial Tr. 24 (Feb. 14, 2008). The district court found that Brockenborrugh committed perjury by falsely denying on the witness stand that he: (1) "evicted the tenants when, in fact, that is precisely what he did on that day in question, and he did it while asserting his authority as an alleged Federal Marshal"; (2) "threatened Ms. Robinson [the executor of the property] . . . that he could influence the police to withdraw their extra attention and protection for the property"; and (3) had an "extremely close, not to say intimate relationship with, Ms. McLeod." *Id.* at 24-25. As regards the third finding, the district court noted that prior to cross-examination Brockenborrugh "pretended that he barely knew her"; "tried to pretend that he did not know where she lived"; and "tried to pretend that they did not have a personal relationship." *Id.* at 24.

## II.

An examination of Brockenborrugh's trial testimony demonstrates a remand for resentencing is required:

**A.** The Eviction. As this court apparently acknowledges by its silence, the district court's finding that Brockenborrugh perjured himself by denying that he evicted the tenants at the Robinson property is clearly erroneous. The government does not maintain on appeal that Brockenborrugh evicted the tenants, and points to no evidence in the record to support such a finding or to rebut the contrary evidence identified by Brockenborrugh that two of the government's own witnesses testified at trial that the D.C. Fire Department conducted the eviction.

**B**. The Threat. The district court found that Brockenborrugh "denied that he threatened Ms. Robinson . . . that he could influence the police to withdraw their *extra* attention and protection for the property." *Id.* at 25 (emphasis added). On appeal, the government maintains that the evidence supported

the finding that Brockenborrugh "threatened to influence the police to withdraw their extra attention and protection of the property and that his denial of having done so was false." Appellee's Br. 60. And, indeed Brockenborrugh was recorded making just such a threat during a pre-trial meeting with Ms. Robinson, and the recording was played in open court for the jury before Brockenborrugh testified. On the recording, Brockenborrugh threatened Ms. Robinson that if he could not buy the property, then the police would no longer provide extra attention and protection to the property on his behalf.[2] But, contrary to the district court's finding, Brockenborrugh did not perjure himself at trial by denying making the threat. Rather, at trial he *admitted* making the threat, testifying that he told Ms.

---

[2] Working with the FBI, Ms. Robinson recorded her meeting with Brockenborrugh and Ms. McLeod on October 19, 2005. Brockenborrugh was recorded telling Ms. Robinson:

> I mean if we, if we . . . were out of this situation they [the squatters] will go back up in there. . . . They'll take those signs up[.] [T]he only, the only reason why the police are doing anything, I know that's their job [. . .] [b]ut you know how police are.
>
> They, you know, they come out and say, hey, I Broch man, I been checking on that house up there and I wanna catch somebody in there, and they said, you know, you still, you still in the mix on this right? I said yeah, please I appreciate it[.] [I]ts okay, now we're going to do this for you. [. . . ]
>
> You know, but . . . [t]hey'll help[.] [I]f, if, I can't, if I don't do my part and get this thing sewed up . . . [t]hey're not gonna[.] [T]hey're gonna stop. [. . .] They're gonna say well, hey, it's like anything else.

Appx. 143-44 (alterations and omissions to improve readability).

Robinson that if she sold the property to someone else, "[the police] wouldn't be going by [the property] on [his] behalf."[3]

The court acknowledges that the district court clearly erred in finding that Brockenborrugh denied threatening to withdraw the extra police attention. Op. at 22. To save the district court's factual finding from being clearly erroneous, the court discovers

---

[3] Brockenborrugh's trial testimony was:

Q: But as a personal favor to you they were looking after that property?

A: A police officers [sic] said that, that as a personal favor to me they would go by and keep an eye on it during the midnight tour, on the evening tour and the day tour.

Q: And do you remember saying to Ms. Robinson, hey you know how the police are though. If I'm not in this anymore, hey you know, they will not go by there anymore?

A: *If she had sold it to somebody else, why — I mean they wouldn't be going there on my behalf. That is their job to go by there and check on that property, or any property.* It is not — it is not — they are no longer doing — I asked him to do me a favor and check on the property. I had never any intention of having them or using that to swindle somebody into selling me their property. I asked them to do it for me as a favorite [sic] to take — I have a lot of friends, elderly friends that say, can you have the police come by? And I say, can you go by and check on somebody's property for me?

Trial Tr. 187 (Oct. 25, 2007) (emphasis added); *see also id.* at 188 ("I said that, you know, eventually, when the property is sold or whatever, they are not going to just go by and check on that one location on a daily basis.").

a second component to the district court's actual finding, effectively making its own findings of fact and concluding that the district court implicitly must have made those findings as well. The court finds that at his pre-trial meeting with Ms. Robinson "Brockenborrugh threatened to have the police stop paying extra attention to the property, which meant, in effect, that the police would leave the property without protection from squatters," Op. at 21, but that he falsely denied making this threat during his trial testimony, *id.* As support for this unarticulated finding by the district court, the court finds that "[a]lthough acknowledging that the police had a general duty to protect all property, Brockenborrugh cynically added, '[Y]ou know how police are,' implying that without his participation the police would do nothing at all to protect this property." *Id.* (quoting Appx. 143). The court proceeds to find that when testifying at trial Brockenborrugh "denied, however, threatening that police protection would cease altogether," *id.*, as a result of the withdrawal of the extra protection, *id.*

"[F]actfinding is the basic responsibility of district courts, rather than appellate courts, and . . . the Court of Appeals should not . . . resolve[ ] in the first instance [a] factual dispute which had not been considered by the District Court." *In re Sealed Case*, 552 F.3d 841, 845 (D.C. Cir. 2009) (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 291-92 (1982) (alterations in original). Thus, where the record evidence is susceptible of more than one reasonable interpretation and the district court fails to make findings on a material issue or where its findings are unclear or incomplete, remand, not affirmance based on *de novo* factfinding by this court, is the proper course. *See id.* at 848; *United States v. Henry*, 557 F.3d 642, 649-50 (D.C. Cir. 2009). Notwithstanding what the district court could have found, this court must be able to "conclude with confidence" from the record that the district court actually made and relied on findings which would support the imposition of the increased

sentence. *United States v. McCoy*, 242 F.3d 399, 411 (D.C. Cir. 2001); *see also Sealed Case*, 552 F.3d at 848. This restraint makes sense: the court owes deference to the district court's findings, not to the findings it could have made. *See United States v. Askew*, 529 F.3d 1119, 1142 n. 4 (D.C. Cir. 2008).

Instead, the court concludes that although the district court actually found that Brockenborrugh falsely denied threatening to withdraw the "extra attention and protection," the district court implicitly found that Brockenborrugh falsely denied that the result of the withdrawal of extra attention would mean, in reality, the withdrawal of all police protection for the property. The effect is to convert the actual finding that Brockenborrugh denied withdrawing "extra attention and protection" into a finding that he denied withdrawing "extra attention and [therefore all] protection." No amount of "context," Op. at 23, can disguise that the district court did not make that finding. Notwithstanding the court's protest that it is not engaging in *de novo* factfinding, *see id.*, the court's holding that the district court did not clearly err in finding Brockenborrugh perjured himself on the witness stand with respect to the threat he made to Ms. Robinson relies only on its own *de novo* factfinding.

The court claims to derive the requisite confidence in its reading of the district court's actual finding from two sources. First, the court states that its interpretation of the district court's finding is "crystal clear," borrowing the phrase that the district court used in describing its confidence in findings that were, as the court acknowledges, *see supra* at 4; Op. at 22, riddled with clear error. Critically the court cannot and does not hold that its reading of the evidence, much less of Brockenborrugh's trial testimony, is the only one that the district court could reasonably have adopted. In both his recorded statement and in his trial testimony Brockenborrugh drew a distinction between the "extra" police attention and protection he asked the police to

provide for the Robinson property and the general attention and protection the police would otherwise provide. *Supra* notes 2 & 3. As a result, it is hardly obvious that in his recorded statement Brockenborrugh implied that without the extra protection the Robinson property would be without any protection at all, but that he denied implying this "threat" in his trial testimony. Second, the court finds support in the government's assertion in its sentencing memorandum that Brockenborrugh falsely denied threatening that he could "'cause the withdrawal of police *attention* to her property' altogether." Op. at 23 (quoting Gov't's Sent. Mem. 7) (emphasis added). But the government's pre-sentencing view of the evidence is not the one that the court now ascribes to the district court. Rather, the court concludes that the district court implicitly found that Brockenborrugh falsely denied that withdrawing the extra attention would result in the loss of all police protection. The government's pre-sentencing claim that Brockenborrugh threatened to withdraw "police *attention*" from the property does not support the conclusion that the district court's finding of a threat to withdraw "extra attention and protection" clearly implied a finding of a threat to withdraw extra attention that would result in the loss of all protection.

How far afield the court has strayed by discovering an implicit component of the district court's factual finding is evident given that it is neither what the district court stated it found nor what the parties argued. Rewriting the district court's findings to match the appellate court's view of a finding that the evidence would support runs contrary to this court's repeated recognition that such *de novo* factfinding is inconsistent with its proper role. *See Henry*, 557 F.3d at 649-50; *Burke*, 888 F.2d at 869; *Askew*, 529 F.3d at 1142 n. 4. Given the district court's "spare explanation," Op. at 22, of its perjury finding, this court must accept the straight forward finding as meaning what the district court stated, reflecting the distinction Brockenborrugh

drew in his testimony between "extra" and general police protection, without recourse to additional words or to an obscure tension between Brockenborrugh's trial testimony and his recorded statement first discovered by this court on appeal.

Because the district court's factual finding about the threat was clearly erroneous, a remand is required unless the district court's third factual finding in support of the increased sentence for obstruction of justice is not clearly erroneous.

**C.** Intimate Relationship. The district court found that in his trial testimony Brockenborrugh "very obviously denied his extremely close, not to say intimate relationship with, Ms. McLeod." Trial Tr. 24 (Feb. 14, 2008). As noted, this finding rested on the grounds, identified by the district court, that Brockenborrugh pretended "that he barely knew her"; "that he did not know where she lived"; and "that they did not have a personal relationship." *Id.* at 24. This court appears to accept that the first two subsidiary findings were clearly erroneous. Op. at 24-25. First, as the government concedes, Brockenborrugh pretended that he did not know where Ms. McLeod lived during a pretrial interview with the FBI, not during his testimony at trial. Second, the court rightly declines to adopt the government's suggestion that in describing his business relationship with Ms. McLeod on direct examination Brockenborrugh "pretended that he barely knew her." This suggestion also appears to have been based on Brockenborrugh's pretrial interview with the FBI, rather than his trial testimony. Such statements to investigators, whether false or not, cannot support the obstruction of justice enhancement because the district court made no finding that Brockenborrugh's denial to the FBI "significantly obstructed or impeded the official investigation or prosecution of the [case]," U.S.S.G. § 3C1.1 cmt. n. 4(g), and the government points to no record evidence to support such a finding.

Still, while accepting that two of the district court's subsidiary findings were clearly erroneous, the court concludes that the district court did not clearly err in finding that Brockenborrugh falsely denied his intimate relationship with Ms. McLeod in the absence of an actual denial by him. It reasons that the district court could properly conclude that by trying to pretend that he did not have an intimate relationship with McLeod, Brockenborrugh constructively denied the relationship. Op. at 24-25. The record demonstrates otherwise. On direct examination, Brockenborrugh did not suggest one way or the other the nature or extent of any personal relationship with Ms. McLeod after he first met her in 1999, and on cross examination he readily admitted that he had an intimate relationship with her beginning in mid or late 2002 and ending in December 2004 or January 2005.

Prior to Brockenborrugh's taking the witness stand, the district court had ruled that the prosecutor could impeach his testimony by inquiring on cross examination about his intimate relationship with Ms. McLeod. *See* Op. at 13. Following this ruling, Brockenborrugh's counsel called him as a witness and asked him to describe "basically [his] relationship" with Ms. McLeod.[4] Brockenborrugh answered, "[w]ell, basically my

---

[4] Defense counsel asked Brockenborrugh whether he knew the co-defendant Denise McLeod and after he responded "Yes, I do," defense counsel asked him to "tell the court, and the jury, and the prosecutor *basically* your relationship with Ms. Denise McLeod." Brockenborrugh answered:

> Well, *basically* my relationship with Ms. McLeod *started in 1999 basically*. I was introduced to her by her husband at Superior Court, because she did taxes. Ms. McLeod did probably about, I would say, 50 percent of the CSOs and people around the courthouse's taxes. Upon, you know, being introduced to her as far as taxes went, she told she did real

relationship with Ms. McLeod started in 1999 basically," *supra* note 4, before explaining how he had met and come to work with her in 1999, six years before the charged conspiracy took place and three years before they had an intimate relationship. His answer neither referred to their intimate relationship in 2002-04 or early 2005 nor to relevant details about the extent of their business interactions, such as how often he had purchased property with Ms. McLeod, *cf.* Trial Tr. 156 (Oct. 25, 2007), and how she had assisted his attempts to obtain the property from Ms. Robinson. His counsel's following questions did not imply that by explaining how he had met Ms. McLeod in 1999, he had failed to answer the question put to him. Rather defense counsel proceeded to inquire about Ms. McLeod's management of Brockenborrugh's rental properties before turning his attention to the Robinson property. On cross-examination, Brockenborrugh testified that he thought he had finished answering his counsel's question by describing "basically" how his relationship with Ms. McLeod had begun.[5]

---

> estate. So at that point, I was interested in buying — I told her that I wanted to buy a four unit apartment building.

Trial Tr. 68-69 (Oct. 25, 2007) (emphasis added). Brockenborrugh then answered questions about the four-unit apartment building and McLeod's work as a property manager for him before counsel directed his attention to his attempted purchase of the property at issue in this case.

[5] On cross-examination, the prosecutor asked Brockenborrugh about his personal relationship with McLeod:

> Q. Now [defense counsel] asked you on direct examination this morning what your relationship was with Ms. McLeod. Did you get a chance to finish that answer?
> A. I think I finished it.

Q. You said you met her in 1999?

A. Yes

Q. And you and she began a business relationship?

A. Yes.

Q. *Did you, in fact, have a much more personal relationship with Ms. McLeod?*

A. *That was later on.*

. . .

Q. When did you begin a more personal relationship with Ms. McLeod?

A. Well, it had to be after she was divorced.

Q. Well, approximately what year do you believe? If you began a business relationship with her in 1999, when did you begin a personal relationship with her?

A. Maybe the middle or end of 2002. There was — but I was not involved in a — I was not her boyfriend or anything.

Q. But you were having sexual relations with her?

A. Yes, I did.

. . .

Q. Okay. And so when [defense counsel] asked you on direct examination about your relationship with Ms. McLeod and you said in '99 I met her and I began a business relationship, you left out the other part?

A. *Left out the other part? In '99 — I wasn't having a relationship with her [in] '99.*

Q. Okay. *So you did not understand Mr. Rosen's question on direct to mean what has been your relationship with Ms. McLeod since 1999?*

A. *Right. I did not understand that.*

. . .

Q. You skipped over that part of your relationship with Ms. McLeod?

A. *It was not asked me, what was my relationship, my personal relationship with her at that time.*

When the prosecutor then asked if he had actually had a "much more personal relationship," he *admitted* that he had, stating "[t]hat was later on." *Supra* note 5. He explained that he had not mentioned the intimate relationship in answering his counsel's question because "[he] wasn't having a[n intimate] relationship with her [in] '99," *id.*, and that he had not understood the question to address their relationship after that time. He then proceeded to describe the intimate relationship in response to further questions on cross-examination.

As a result, the district court's finding that on the witnesstand Brockenborrugh "very obviously denied his extremely close, not to say intimate relationship, with Ms. McLeod,*"* Trial Tr. 24 (Feb. 14, 2008), is clearly erroneous. No matter how diligently one searches his trial testimony, he never denied having this relationship; instead he admitted it. Yet the court finds no clear error, reasoning that because Brockenborrugh was "on notice" that his intimate relationship with Ms. McLeod was "relevant," "[i]t is fair to infer that Brockenborrugh was intentionally concealing the true nature of his relationship when he testified that his prior description [on direct examination], which made no mention of the romance, was complete." Op. at 24. The court's approach is flawed.

First, Brockenborrugh's answer on direct examination did not suggest anything to the jury about the full extent of his business or any personal relationship with Ms. McLeod after 1999. Nor could his statement on cross examination that he thought he had finished answering defense counsel's question. The transcript of his trial testimony would not support a finding that as a result of these answers the jury was led into thinking he was denying having an intimate relationship with Ms. McLeod.

*Id.* at 133-38 (emphasis added).

The government's brief unhelpfully characterizes defense counsel's question as an "opened-end" invitation to "tell the jury about his relationship with McLeod," omitting the word "basically." Appellee's Br. 59; *see supra* note 5. The brief also overlooks that Brockenborrugh's response expressly limited his description to the relationship's starting point. Moreover, no evidence pointed to by the government rebuts the express limitation in defense counsel's question and in Brockenborrugh's answer by showing that he considered his intimate relations with Ms. McLeod in 2002-04 or early 2005 to be a fundamental part of their relationship. Rather, while admitting they had sex during that time, he testified he was "not her boyfriend or anything,"*supra* note 5, and the district court sustained the defense objection when the prosecutor referred to their relationship as an "affair," Trial Tr. 135 (Oct. 25, 2007).

Second, far from demonstrating that the district court's finding was not clearly erroneous, the court's reasoning explains only why the district court could have found that Brockenborrugh purposefully did not mention the intimate relationship until he was asked a question that required him to do so. Brockenborrugh was "on notice," Op. at 24, that he could be impeached on cross examination about his intimate relationship with Ms. McLeod, *see* Op. at 13 (quoting the district court, Trial Tr. 57 (Oct. 25, 2007)), not that he was expected or somehow obligated to divulge it on direct examination. Even assuming a better defense strategy would have been to disclose the intimate relationship on direct examination, and avoid the almost certain possibility the subject would be raised during cross-examination and afford the prosecutor an opportunity to question whether he had been less than fully responsive to his counsel's question, this is not the same as Brockenborrugh denying he and Ms. McLeod had an intimate relationship. And even assuming that the district court concluded that Brockenborrugh intended to conceal the true

nature of the relationship, the trial transcript shows that he did not do what the district court found he did: he did not deny during his trial testimony the existence of his intimate relationship with Ms. McLeod. Because the district court's finding that he did is without basis in the record, it is clearly erroneous.

\* \* \* \*

In our legal system different roles are assigned to trial and appellate courts, and it behooves this court not to blur the lines. The district court found Brockenborrugh's sentence should be increased because he perjured himself by falsely denying he evicted the squatters, threatened to withdraw extra police attention and protection, and had an intimate relationship with Ms. McLeod. His denial of evicting the tenants was not false and he admitted threatening to withdraw the extra police attention and protection and having an intimate relationship with Ms. McLeod. To overcome those admissions, the court infers findings that the district court did not make. Our review is narrowed by the deference owed to the district court's factual findings, but this court cannot affirm on the basis of a finding of a false denial that the district court could, but did not, make. Nor can it affirm on the basis of testimony that is not actually false simply because the district court could permissibly have found that Brockenborrugh harbored an intention to keep information from the jury until he was asked directly about it. Whether the district court would have so found is for the district court to decide, not for this court to infer.[6] Accordingly,

---

[6] The Supreme Court instructed in *United States v. Dunnigan*, 507 U.S. 87, 96 (1993), that if the defendant objects to a sentence enhancement under U.S.S.G. § 3C1.1. resulting from his trial testimony, as occurred here, "a district court must review the evidence and make independent findings necessary to establish a willful

because none of the three factual findings supporting the two-level upward enhancement of Brockenborrugh's sentence for obstruction of justice under U.S.S.C. § 3C1.1 survive clear error review, I would remand the case for resentencing; otherwise I concur.

---

impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out. *See* U.S.S.G. § 6A1.3 (Nov. 1989); FED. R. CRIM. P. 32(c)(3)(D).  See also *Burns v. United States*, 501 U.S. 129, 134 (1991).  When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding."